This is an appeal by plaintiff, Masterclean, Inc., from a judgment of the Ohio Court of Claims awarding plaintiff $28,518 on two claims arising from an asbestos abatement contract. The court denied various other claims brought by plaintiff, resulting in the instant appeal.
The underlying action, involving a contract dispute between plaintiff, an asbestos abatement provider, and defendant, the Ohio Department of Administrative Services, was tried before the Court of Claims without a jury. Plaintiff was the successful bidder on a project to perform asbestos abatement of underground tunnels located at the Western Reserve Psychiatric Hospital ("Western Reserve") and the Massillon Psychiatric Hospital ("Massillon"). Plaintiff entered into a contract (contract No. 580-91-027-003-002) with defendant on January 22, 1993, under which plaintiff was to perform the abatement work for a price of $113,459.
Defendant hired Chryatech, Inc. ("Chryatech"), an expert in asbestos abatement, as the contract associate. The contract between plaintiff and defendant provided that plaintiff would do the work according to plans and specifications provided by Chryatech for the removal of asbestos and reinsulation of underground utility pipes. The abatement work first took place at the Massillon site. At issue in the instant case are facts and circumstances surrounding only the work performed at Western Reserve.
Work at the Western Reserve site began on April 4, 1993. Throughout the course of the project, plaintiff submitted to defendant a number of change order requests seeking additional compensation totaling approximately $220,000. While the subject of the various claims will be more fully discussed under the specific assignments of error, the claims at issue include plaintiffs contention that it was entitled to additional compensation for: (1) complying with the preparation of work area requirements set forth in Articles 3.02(I) and 3.02(J) of Section 02080 of the contract; (2) removing debris from tunnels C-21, C-30, C-31 and C-32; (3) removing sidewalk slabs and constructing an above-ground containment structure over certain tunnels; (4) delay by defendant in carrying out a required work inspection; (5) costs attributable to a shutdown of the work site from May 13, 1993 through July 12, 1993; (6) a deduct change order issued by the state reflecting $15,200 paid to Cardinal Environmental Services; and, (7) a theft loss incurred when certain property owned by plaintiff was stolen during a shutdown period.
Plaintiff filed its complaint in the Court of Claims on April 13, 1995, alleging breach of contract and breach of an implied covenant of good faith and fair dealing. Plaintiff's complaint sought damages against defendant in the amount of $224,409.97, plus interest and costs. The matter was tried by the court beginning on June 16, 1997.
The trial court issued a decision on May 11, 1998, finding in favor of plaintiff in the amount of $28,543 on claims involving a shutdown delay period ($23,572) and insulation work ($4,946). The trial court denied plaintiff's claims related to work preparation, debris removal, the removal of sidewalk and construction of an above-ground containment, an alleged inspection delay, plaintiff's theft loss and deduct change order.
On appeal, plaintiff sets forth the following eleven assignments of error for review:
 1. THE TRIAL COURT ERRED IN FINDING THAT CONTRACTOR FAILED TO ASSESS THE SCOPE OF THE WORK THROUGH AN INSPECTION WHEN THE WORK TO BE PERFORMED IS EXPRESSLY SET FORTH AND IDENTIFIED BY THE CONTRACT.
 2. THE COURT ERRED IN FINDING THAT PLAINTIFF WAS OBLIGATED TO PERFORM ADDITIONAL WORK, WITHOUT COMPENSATION WHEN THE PARTIES ARE UTILIZING A GENERIC SET OF ASBESTOS ABATEMENT SPECIFICATIONS WHICH CONTAIN SPECIFIC EXPRESS PROCEDURES APPLICABLE TO THE ABATEMENT OF TUNNELS, AND THE COURT RELIES UPON SPECIFICATIONS PERTAINING TO ASBESTOS REMOVAL IN AREAS OTHER THAN TUNNELS.
 3. WHEN PARTIES CONTRACT ON THE BASIS OF AN AGREEMENT WHICH SPECIFICALLY IDENTIFIES THE TUNNELS FROM WHICH DEBRIS IS TO BE REMOVED, THE COURT ERRED IN FINDING THAT THE CONTRACTOR'S DUTIES WERE EXPANDED BY AN INSPECTION WHICH MAY HAVE DISCLOSED THE EXISTENCE OF DEBRIS IN OTHER TUNNELS ABSENT AN AMENDMENT TO THE CONTRACT RELATING TO SUCH ADDITIONAL WORK.
 4. THE COURT ERRED IN FINDING THAT AN AGREEMENT WAS REACHED FOR ADDITIONAL WORK TO BE PERFORMED AT CONTRACTORS COST WHEN THE CONTRACT PROVIDES THAT CONTRACTOR SHALL BE COMPENSATED FOR ADDITIONAL WORK, THE TESTIMONY OF CONTACTORS' WITNESSES IS THAT COMPENSATION WOULD BE PAID; NO TESTIMONY IS PRESENTED IN SUPPORT OF THE ALLEGED AGREEMENT BY THE INDIVIDUAL WHO ALLEGEDLY ENTERED INTO THE AGREEMENT AND NO WRITTEN WAIVER OF PAYMENT WAS OBTAINED EVEN THOUGH THE PRACTICE OF THE PARTIES WAS TO EXECUTE WRITTEN WAIVERS.
 5. THE COURT ERRED IN DENYING A CHANGE ORDER REQUEST BASED UPON A FINDING THAT AN EPA CEASE AND DESIST ORDER WAS COMMUNICATED ON MAY 11, 1993, WHEN IN FACT, SAID ORDER WAS NOT COMMUNICATED TO THE CONTRACTING PARTIES UNTIL MAY 13, 1993.
 6. WHEN THE COURT FINDS DEFENDANT RESPONSIBLE FOR EQUIPMENT CHARGES ARISING FROM DELAYS IN PERFORMANCE OF WORK ATTRIBUTABLE TO A WRONGFUL CONTRACT TERMINATION; WRONGFUL IMPOSITION OF "DRY REMOVAL" REQUIREMENTS, AND THE UNAVAILABILITY OF ITS ON-SITE REPRESENTATIVE, AND SUCH DELAYS TOTAL 36 DAYS, IT IS ERROR TO AWARD DAMAGES ON THE BASIS OF DEFENDANT BEING RESPONSIBLE FOR A DELAY OF JUST 28 DAYS.
 7. GIVEN THAT THE TRIAL COURT FOUND THAT DETERIORATION OF CONDITIONS CAUSING COSTS OF $23,235.91 COULD EASILY HAVE TAKEN PLACE WITHIN JUST 33 DAYS, THE COURT ERRED IN DENYING RECOVERY WHEN THE COURT'S OWN FINDINGS PLACE RESPONSIBILITY FOR MUCH OF THE INITIAL DELAY UPON DEFENDANT.
 8. WHERE DEFENDANT HAS ORDERED A CONTRACTOR OFF A WORK SITE AT A STATE MENTAL HEALTH HOSPITAL; HAS ISSUED A CONTRACT TERMINATION NOTICE PURSUANT TO WHICH ALL OF CONTRACTORS EQUIPMENT BECOMES THE PROPERTY OF THE STATE OF OHIO; AND CONTRACTOR IS NOT ALLOWED TO RETURN TO THE SITE WITHOUT APPROVAL FROM DEFENDANT, THE TRIAL COURT ERRED IN DENYING A CHANGE ORDER REIMBURSING CONTRACTOR FOR THE THEFT OF THE EQUIPMENT LOCATED AT THE HOSPITAL BASED UPON A FINDING THAT THE DEFENDANT DID NOT HAVE CONTROL OF CONTRACTORS PROPERTY AT THE TIME SAID PROPERTY WAS STOLEN.
 9. THE TRIAL COURT ERRED IN SETTING OFF AGAINST MONIES OTHERWISE PAYABLE TO CONTRACTOR $15,200 IN CHARGES BY A SUBSTITUTE CONTRACTOR WHEN DEFENDANT FAILED TO MEET CONDITIONS PRECEDENT FOR A SET OFF.
 10. THE TRIAL COURT ERRED IN MAKING FINDINGS THAT THE WORK OF A SUBSTITUTE CONTRACTOR: (1) WAS FOR THE PURPOSE OF PREVENTING CONTAMINATION OF THE ENTIRE SITE; (2) WAS COSTLY DUE TO HIGH RISK; (3) WAS PERFORMED AT THE LAST MINUTE; AND (4) THAT THE SUBSTITUTE CONTRACTOR STOPPED OTHER PROJECTS TO WORK AT THE SITE, BASED UPON A COMPLETE ABSENCE OF ADMISSIBLE EVIDENCE SUPPORTING SUCH FINDINGS.
 11. PREJUDGMENT INTEREST SHOULD BE AWARDED IN ORDER TO COMPENSATE A CONTRACTOR FOR SERVICES RENDERED UNDER A CONTRACT ACCEPTED BY THE STATE OF OHIO ON SEPTEMBER 12, 1994, AND THE TRIAL COURT ERRED IN NEITHER ADDRESSING NOR AWARDING PREJUDGMENT INTEREST.
The instant case involves issues dealing with the interpretation of contract language, as well as the trial court's findings of fact as to circumstances related to the contract. In general, the construction and interpretation of contracts involve matters of law, and an appellate court applies a de novo review of questions of law. Tabeling v. CBCCompanies, Inc. (Mar. 10, 1997), Stark App. No. 1996CA00175, unreported. However, regarding findings of fact, "we will not substitute our judgment for that of the trial court where some competent, credible evidence exists to support the findings of fact and conclusions of law rendered by the trial court." Id.
See, also, C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279
(judgments supported by some competent, credible evidence going to all of the essential elements of the case will not be reversed as being against the manifest weight of the evidence).
By way of factual background, the contract at issue, which required plaintiff to perform asbestos abatement at the two mental health facilities, involved work primarily confined to tunnel areas at the sites. Both facilities contained underground steam pipes serving the various buildings. Many of the pipes were covered with asbestos insulation, and the project required plaintiff to remove the asbestos insulation and reinsulate the pipes.
As part of the general abatement process, workers are required to first seal off any openings to the work area. A negative air machine is installed at the work site to contain airborne fibers. A "decon system" is also installed, consisting of a shower and change room for employees. The project at issue employed "wet cleaning" methods, whereby the workers initially wet the coring on the asbestos piping insulation. Once the asbestos is removed, the lines are cleaned and the surfaces of the tunnel are washed down. A coating of encapsulation is applied to the area to seal surfaces and ensure that fibers do not later become airborne. The pipes are then reinsulated with fiberglass.
While specific portions of the contract will be addressed more fully below, we note the following provisions set forth under the "General Conditions" section of the project manual. Article 2 of the General Conditions, entitled "Contract Documents," provides:
 Contract documents means collectively all of the various portions of this Contract, to wit; Notice to Bidders, Instruction to Bidders, Proposal, Contract, Bond, Equal Employment Opportunity Bid Conditions, General Conditions, Special Conditions, Plans and Specifications, all Addenda issued prior to execution of the Contract and all modifications thereto. Modifications may be made only after execution of the Contracts by Contract Change Order.
Article 3(a) of the General Conditions provides that "[t]he location and extent of work shall be shown or defined on the Contract Drawings or in the Specifications covering the Contract or Contracts involved." Article 5(f) states: "It is understood and agreed by the contractor, that the work herein described is intended to be completed in every detail. The Contractor shall be held to provide all labor and materials necessary for the entire completion of the work described in the Contract Documents and reasonably implied therefrom."
Article 6(c), pertaining to damages for delays, states that:
 There is no liability for damages resulting from delay caused by third persons which is not the result of interference on the part of the State as a contracting party. Any liability that may ensue that is caused by the failure of any Contractor to finish its portion of the work at a scheduled time is the responsibility of that Contractor and its Surety.
Article 7(e) of the contract addresses "changes from original plans," and states:
 Should the Contractor or Owner encounter or discover during the progress of the work, subsurface or latent physical conditions at the site differing materially from those indicated on the contract documents, or unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract, the Associate shall be promptly notified in writing of such conditions before they are disturbed. The Associate will thereupon promptly investigate the conditions and if the Associate finds they do so materially differ from those indicated on the contract documents and cause an increase or decrease in costs of, or the time required for the performance of the Contract, an equitable adjustment will be made. If no equitable adjustment can be agreed upon between the parties, the dispute shall be determined as provided in Article 8 of these General Conditions.
Article 8(a) of the General Conditions addresses procedures for disputes, and states:
 Except as otherwise provided in this Contract, any dispute concerning a question of fact arising under this Contract which is not disposed of by agreement with the Associate shall proceed as follows. The Associate shall review the dispute with the Contractor, the Architect's project representatives, and the Sponsor Agency representative. Serious consideration should be given to resolve the dispute at the field level. Should the dispute not be resolved, the Associate shall forward to the Architect within ten (10) days all the information concerning the dispute including written comments from all parties involved. The Architect shall review the information and render a decision in writing to the contractor. The decision of the Architect shall be final and conclusive unless, within thirty (30) days from the date of receipt, the Contractor furnishes the Architect a written appeal addressed to the Deputy Director. The Deputy Director shall then review the dispute and make a decision, which decision shall be final and binding upon all parties so concerned.
Plaintiff's first, second, third and fourth assignments of error are interrelated and will be considered together. Under these assignments of error, plaintiff contends in general that the trial court erred in finding that the contractor failed to assess the scope of the work as it related to change order requests for preparation of work areas, debris removal and the construction of above-ground containment.
We will first address plaintiff's contention that the contract did not require it to wrap all fixed objects within the tunnels. The issue of work preparation was the subject of plaintiff's change order request No. 1. The facts surrounding this assignment of error indicate that, in April 1993, plaintiff's general manager, William Smith, sent a letter to Roger Beaupre, a Chryatech associate, asserting that Chryatech's required method of "prepping tunnels" at the Western Reserve site would increase the cost of the project. More specifically, Smith challenged Chryatech's directive that plaintiff wrap fixed objects in the tunnels, including fiberglass pipe insulation, with polyethylene sheeting. Smith asserted that the method was "unnecessary to accomplish the goals of this project." Plaintiff wrapped the fixed objects at the direction of Chryatech, and subsequently sought compensation on the basis that the directive constituted a change in the contract provisions. Plaintiff's change order request No. 1 sought additional costs in the amount of $25,349.27. Plaintiff challenged the method of preparation under Article 8 of the General Conditions.
It was the position of Chryatech and defendant that the required method was part of the contract. Chryatech's project manager, Beaupre, responded to Smith by letter dated April 20, 1993. Citing to Specification 02080, Article 3.02(I), Beaupre stated that all fixed objects were required to be sealed in polyethylene sheeting, and that "[f]ixed objects is a category that includes fiberglass insulated pipe." Beaupre instructed Smith that "Masterclean, Inc. shall continue to protect fiberglass insulated pipes in Work Areas as directed in the Contract Documents, at no increase in the Contract Sum or Contract Time."
Specification 02080, Article 3.02(I), pertaining to "work/area preparation," provides as follows:
 Preclean all fixed objects and surfaces within the work area using HEPA filtered vacuum and/or wet cleaning methods as appropriate. Careful attention must be paid to machinery and equipment behind grilles or gratings where access may be difficult but contamination significant. Also pay particular attention to wall, floor and ceiling penetrations behind fixed items. Do not use any methods that would raise dust such as dry sweeping or vacuuming with equipment not equipped with HEPA filters. Do not disturb asbestos-containing materials during the precleaning phase. Seal all fan coil units, radiators and all other fixed objects with polyethylene sheeting and tape.
Plaintiff argues that, in performing asbestos abatement at the Massillon facility, which preceded work at Western Reserve, it was not required to comply with the requirements of Article 3.02(I). Rather, plaintiff contends, in performing the work at Massillon, the evidence indicates that it followed the provisions specified under Article 3.02(K), which states as follows:
 In work areas consisting of crawl spaces or tunnels only, the Contractor shall install one layer of 6 mil polyethylene on the floor of the work area directly under the asbestos-containing material to be removed to protect the floor. At the end of stripping activities, the floor polyethylene shall be cleaned of visible debris and discarded as contaminated waste. All exposed surfaces in the work area shall be thoroughly wet cleaned and/or HEPA vacuumed as appropriate and all surfaces thoroughly encapsulated per Section 02081.
The trial court found that plaintiff was required, pursuant to Article 3.02(I) of the contract, to wrap all fixed objects in the tunnels. In asserting that the trial court erred in its determination, plaintiff asserts that Article 3.02(I) is a generic (i.e., general) provision, whereas Article 3.02(K) is specific as to the particular work at issue and therefore controls. Plaintiff further contends that the conduct of the parties "unambiguously" points to Article 3.02(K) as controlling, and plaintiff disputes findings by the trial court regarding differing conditions at the Massillon and Western Reserve facilities, as well as the court's finding that electric lines at Western Reserve were required to be wrapped for protection.
In general, when interpreting contracts, "[t]he meaning of a contract is to be determined by considering all of its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." State Auto. Ins. v. Childress (Jan. 15, 1997), Hamilton App. No. C-960376, unreported. Further, "[c]onstruction of the contract should attempt to harmonize all of the provisions rather than create conflicts in them," and a court "must determine whether the contract can be interpreted giving reasonable, lawful, effective meaning to all terms." Id.
Upon review of the contract language at issue, we disagree with plaintiff's contention that Article 3.02(K) is more specific than Article 3.02(I). Although Article 3.02(K), which makes reference to "tunnels," arguably modifies the immediately preceding paragraph (Article 3.02(J)), pertaining to preparation of the floor work area, we do not construe Article 3.02(K) as overriding the requirement of Article 3.02(I) for the sealing of fixed objects. In the present case, the majority of the work on the project involved abatement inside the tunnels, and it is clear that other requirements of Specification 02080, Article 3.02, while they do not specifically refer to tunnels (but instead generically refer to the "work area"), were applicable to the project. These other requirements included the installation of "asbestos filtration devices * * * within the work area," Article 3.02(E), presealing all "openings in or out of the work area," Article 3.02(F), as well as installing a decontamination facility to be "used in the specified manner by all persons entering and exiting the work area," Article 3.02(L). At trial, plaintiff's employee, John Buford, acknowledged that the specifications contained provisions which plaintiff, in preparing its bid, would have considered as requirements under the contract even though such provisions made no specific reference to tunnels or crawl spaces. Construing the provisions as a whole, and guided by the principle that a construction giving reasonable meaning to all parts of a contract is preferred over one that leaves portions of the contract meaningless, we reject plaintiff's interpretation that Article 3.02(K) was to be applied to the exclusion of Article 3.02(I).
At trial, Chryatech's project manager testified regarding the need for sealing fixed objects. Specifically, during direct examination, Beaupre gave the following testimony on this issue:
 Q. It's the contention — allegation of Masterclean in this case that Chryatech, on behalf of the State of Ohio, unfairly imposed spec Section I on the work that Masterclean did at Western Reserve. Do you agree or disagree with that?
A. I would certainly disagree with that.
Q. Why?
 A. Well, these two situations — here at Massillon, the tunnels were by and large abandoned, they had few nonoperating systems in them, few fixed items in them. We deemed it actually to the benefit of everyone to not bother with some of the more stringent work area preparation requirements because on completion of work these tunnels were going to be demolished. Rather than go through the time of work area preparation we would, except for an occupied area or an area reoccupied, we simply did not insist on them complying with all of these requirements.
 Q. * * * Spec Section I would require what, generally speaking?
 A. It talks about precleaning the fixed items in the work area and sealing those fixed items with plastic sheeting to actually protect them from any of the work that goes on in the work area. Basically places these items outside of the work area.
Q. Sealing the fixed objects or items, correct?
A. Correct.
Q. Essentially is what I requires?
A. Yes.
 Q. What are the fixed objects that would have been encountered in the tunnels at Western Reserve that would be required to be sealed?
 A. There was a considerable amount of operative steam pipes with fiberglass insulation, and they would be sealed to protect the fiberglass insulation in the jacketing. There was electrical conduit that needed to be protected, and these were the two primary items. There might have been switches or electrical items of a small nature, but those were the two primary fixed items.
 Q. I think it's probably important to distinguish there were fiberglass insulated pipes in the tunnels at Western Reserve?
A. Yes.
 Q. Do you know what those pipes would have carried?
A. They were steam heating system piping.
* * *
 Q. * * * What was the purpose of sealing the fiberglass insulation that was not going to be removed from the tunnel in Western Reserve?
 A. Part of the cleaning process requires wet cleaning — wet cleaning methods and obviously using water and getting it on the fiberglass insulation it can reduce the ability of the insulation to act as an insulator, and that water would also, once it's in the insulation, can cause deterioration of the piping.
 One of the other purposes of presealing objects is to make it easier to clean them afterwards. If you have plastic over some pipes, that insulation is a lot easier to wipe off the plastic encapsulate then [sic] to truly clean and decontaminate all surface objects and the fiberglass insulation. (Tr. 793-797.)
Upon review, the record contains evidence supporting the trial court's finding that the requirements for precleaning were relaxed at the Massillon site because a large number of the tunnels at that site were to be abandoned. In contrast, there was evidence that many of the tunnels at the Western Reserve site would remain in use. As noted above, Beaupre testified that, except for areas at Massillon that involved an occupied area, the more stringent requirements for work area preparation were not enforced at that site. There was also testimony that, because of the "wet cleaning" process employed, fixed objects at the Western Reserve site had to be sealed to protect fiberglass insulation as well as electrical conduit.
Plaintiff further contends that, even if the provisions at issue are "construed to create an ambiguity," plaintiff's change order should nevertheless be found proper. We note that, in addressing the work preparation claim, the trial court also found that plaintiff failed to exercise due care by not attending the pre-bid inspection. Article 4(A) of the "Instructions to Bidders" provides that the "[f]ailure of a Bidder to become fully acquainted with the amount and nature of work required to complete its division of the work in conformity with all requirements for the project as a whole will not be considered subsequently as a basis for extra compensation."
While we disagree with plaintiff's construction of the contract, even assuming, arguendo, that the contract contained an ambiguity based upon a conflict between the paragraphs at issue, the interpretation offered by plaintiff suggests an ambiguity which should have been patent to an experienced contractor. "The existence of a patent ambiguity in a government contract 'raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation.'"Triax Pacific, Inc. v. West (Fed. Cir. 1997), 130 F.3d 1469,1474. Such a duty of inquiry "prevents contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations in preparing their bids and then, after the award, seek equitable adjustments to perform the additional work the government actually wanted." Id. at 1475. Thus, in the present case, even assuming an ambiguity in the contact language, we agree with the trial court's determination that clarification of the provision related to sealing fixed objects was available to plaintiff, had it attended the pre-bid inspection or made an inquiry prior to submitting its bid.
Plaintiff further contends that the trial court erred in failing to award additional compensation for costs incurred in debris removal, as well as expenses related to plaintiff's removal of concrete slabs and construction of an above-ground containment at two specific work areas where the tunnels were too small for workers to gain underground access.
Regarding the debris removal claim, the record indicates that, in April 1993, Smith sent a letter to Beaupre addressing Chryatech's requirement that plaintiff remove debris from four tunnels (designated Tunnels C-21, C-30, C-31 and C-32). Smith asserted that the contract specifications designated only one tunnel as requiring debris removal, and that additional costs had been incurred due to leaves, mud and foreign objects in the work areas. Plaintiff submitted change order request No. 2 for expenses it alleged were incurred as a result of these conditions.
Plaintiff's basic contention, as indicated above, is that only one tunnel (Tunnel C-26), was designated as a "Debris Area" in the contract, and that plaintiff was required to remove debris from four tunnels not designated as debris removal areas. At the outset, while plaintiff maintains that only one tunnel was designated as a "debris area," plaintiff appears to construe this term to mean any type of debris. However, the project notes to the material removal schedule reflect that the reference to "debris area" contemplates "the removal of asbestos debris." (Emphasis added.) Chryatech's project manager, Beaupre, testified that the work area at issue "refers to asbestos-containing insulation and the removal of asbestos debris[,]" in particular, "pipe insulation that has fallen to the floor." (Tr. 803.) The plain language of the agreement supports this interpretation.
The trial court concluded that plaintiff would have discovered the condition of the tunnels if its representatives had attended the pre-bid inspection. The court noted that, although the tunnels were not designated as work areas for debris removal, "they were designated as work areas for asbestos abatement. As a result, the tunnels would have been visited on a pre-bid inspection for the purpose of asbestos abatement." There was evidence to support the trial court's finding on this issue. Beaupre testified that a bidder attending the pre-bid inspection at Western Reserve would have been able to observe debris in the work area. Further, the "material removal schedule," which was part of the contract, provided that "[t]he Contractor shall confirm all existing * * * site conditions prior to the submission of bids." As a general rule, "a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove * * * that he was misled by the contract." Vann v. United States (1970), 420 F.2d 968, 982. As found by the trial court in the instant case, plaintiff ignored the contract admonitions to investigate the site prior to the submission of bids.
We note that the evidence in this case does not suggest that the state attempted to misrepresent the work to be performed. In this regard, the record indicates that plaintiff was compensated for a differing site condition related to certain debris that plaintiff could not have been aware of at the time of the bidding. Specifically, defendant made an adjustment for mud and silt that accumulated in the tunnels between the time of the bid and the beginning of abatement work. This adjustment was the subject of plaintiff's change request order No. 8, under which plaintiff sought compensation in the amount of $15,027.84 for "extra mud/silt removal from work area four." However, as to the debris already existing at the time of the bidding, the record indicates that such condition was capable of determination by an inspection which plaintiff chose not to undertake.
Plaintiff also submitted a change order request for additional compensation related to the removal of sidewalk slabs. The trial court found that plaintiff should have been aware of the tunnel dimensions and accessibility of the tunnels. The trial court's findings note that, after plaintiff began working in tunnels C-30, C-31 and C-32, it discovered that the space in the tunnels was inadequate to perform the abatement work. Plaintiff requested permission from defendant to access the tunnels by removing the concrete slabs located above the tunnels. While the contract provided that the concrete slabs were not to be removed, defendant granted permission with the understanding that removal of the slabs would be at plaintiff's cost. The trial court concluded that information regarding the dimensions of the tunnels was available to plaintiff by virtue of the pre-bid inspection process and by reference to addendum Nos. 2 and 3 to the contract, which set forth the tunnel dimensions.
Upon review, there was evidence to support a finding that information available to bidders through a pre-bid inspection and contained in the addendums, should have provided notice of potential difficulties in obtaining access to the tunnel areas. As previously noted, the contract placed upon the contractor the responsibility of determining site conditions, and contractors bidding on the project had an opportunity to inspect the site prior to submitting a bid. In the instant case, visits were scheduled to both Western Reserve and Massillon, and those contractors who chose to attend walked through the tunnel areas. Plaintiff's president, William Smith, acknowledged during cross-examination that plaintiff "did not attend the prebid walk-through, we did not inspect the site." (Tr. 587.) He admitted that in some of the tunnels, access was not a problem and that a pre-bid inspection would have revealed the tunnel dimensions and the number of utility pipes in the tunnels. Chryatech's project manager Beaupre disputed at trial the contention that all of the tunnels would not have been accessible during the walk-through or that sidewalk slabs would have needed to be removed to assess the dimensions. He stated that those attending the inspection would have been able to observe the dimensions, as well as the number and type of pipes in the tunnel. Beaupre noted that bidders could have inspected one of the tunnels at issue by entering the tunnel through a building, as well as by means of a manhole opening. Based upon the record in this case, we will not disturb the trial court's finding that a pre-bid inspection would have put plaintiff on notice of the conditions and that plaintiff could have adjusted its bid accordingly.
Plaintiff also contends that there was no credible evidence that it agreed to remove the slabs at no extra cost. However, part of the evidence submitted at trial included the minutes of a meeting on July 20, 1993, involving this change order request. Beaupre testified that he attended the meeting and prepared the minutes. The minutes reflect that it was the view of Chryatech's representative that "the construction of the enclosure and the removal of the slabs was approved by the Owner to assist Masterclean but was done only with the understanding that no cost associated with this would be the responsibility of the Owner." The meeting notes further indicate that this understanding "was confirmed by Tim Reder," a representative with the State Architects Office, who attended the meeting. While plaintiff disputed that it ever agreed to remove the slabs at no extra cost, we will not disturb the trial court's determination on this issue as against the weight of the evidence.
Based upon the foregoing, we find that the trial court correctly construed the contract language as to the issue of work preparation and, further, that the court's findings that plaintiff failed to assess the scope of the work by not inspecting the proposed work site are supported by competent, credible evidence. Accordingly, plaintiff's first, second, third and fourth assignments of error are not well-taken and are overruled.
Under the fifth assignment of error, plaintiff argues that the trial court erred in denying a change order request on an inspection delay claim. Plaintiff contends that work at one of the tunnels was due for inspection on May 11, 1993, but that a cease and desist order was not communicated to plaintiff until May 13, 1993. Plaintiff argues that it is entitled to compensation for this time period.
On August 18, 1993, Smith sent a letter to Beaupre requesting reimbursement for a purported work delay. Smith stated that preparation work had been completed on May 11, 1993, before 1:00 p.m., and that a Chryatech technician was notified that plaintiff was awaiting the inspection. Smith stated in the letter that plaintiff had three men on standby waiting for the inspection that afternoon, as well as for ten hours the following day (May 12), and two and one-half hours on May 13, at which time plaintiff was ordered by the state to shut the project down. Plaintiff sought reimbursement "[d]ue to the extended waiting time."
The evidence indicates that the project site at Western Reserve was shut down as a result of an EPA inspection. The shut down was precipitated by events on May 11, 1993, when an inspector from the EPA came onto the work site at Western Reserve. The inspector, upon opening bags of asbestos-containing waste, discovered dry material in the bags. The inspector informed Chryatech's employees that plaintiff had not been adequately wetting the asbestos at the site. A cease and desist order was issued on May 13, based upon violations of federal regulations.
Richard A. Piloseno, a field-monitoring technician with Chryatech, provided testimony surrounding the events during this time period. On May 11, 1993, two representatives of the EPA met with one of plaintiff's employees, John R. Buford. Piloseno and another Chryatech representative, Mike Diemer, also met with EPA personnel.
On that date, Piloseno had discovered a "suspect" piece of material outside of the containment area. At approximately 4:30 p.m. that afternoon, Piloseno entered a work area where abatement removal was being conducted and observed a worker filling waste disposal bags with water from a hose. Piloseno noted between twenty-five to fifty bags of dry material.
Following this inspection, Piloseno ordered the work area to be sealed up until the problem of dry material could be remedied. Plaintiff's employees were told to shower and leave. A short time later, the workers returned to the work area. Piloseno and Diemer were attempting to retain some of the bags of dry material when one of plaintiff's employees attempted to take the bags. Piloseno tried to prevent the employee from taking a bag through the shower area, but the worker pushed Piloseno and then struck him in the face, breaking Piloseno's nose.
The trial court, in rejecting plaintiff's claim for compensation during this time period, concluded that, "[e]ven if defendant's inspection had been performed immediately, the court finds that plaintiff would not have been able to resume work. The inspection by the EPA was performed at the beginning of the two and one-half day period upon which plaintiff's claim is based." Based upon the trial court's finding that "no additional work was able to be performed" following the EPA's initial inspection, the court concluded that "defendant was not the cause of the delay."
Where a claim being asserted by a contractor "is based upon alleged government-caused delay, the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by the government action, and that the delay harmed the contractor." Wilner v. United States (Fed. Cir. 1994), 24 F.3d 1397, 1401. Further, "[a] contractor is not entitled to an equitable adjustment pursuant to a suspension of work when the contractor was the cause of the suspension of work." HVAC Construction Co., Inc. v. United States (July 16, 1993), 28 Fed.Cl. 690, 693. Under the contract at issue, plaintiff was required to comply with applicable federal regulations. The record in this case, including evidence of the EPA's initial inspection on May 11, the assault of a Chryatech worker by one of plaintiff's employees, as well as evidence that plaintiff's work practices were not in compliance with EPA regulations on that date, amply supports the trial court's finding that defendant was not the cause of this delay. We conclude that the trial court did not err in denying plaintiff's claim on this issue.
Plaintiff's fifth assignment of error is overruled.
Under the sixth assignment of error, plaintiff contends that the trial court erred in finding defendant responsible for only twenty-eight days of delay arising out of a sixty-one day work shut down during the project. Plaintiff argues that delays attributable to the defendant resulted in thirty-six days of delay rather than the twenty-eight day total found by the trial court. Plaintiff maintains that delays resulted from defendant's wrongful termination of the contract, defendant's imposition of "dry removal" requirements, and the unavailability of its on-site representative at the time plaintiff was ready to proceed.
As previously noted, a cease and desist order was issued by the EPA on May 13, 1993, based upon the EPA's finding that the methods employed in the abatement process were in violation of federal regulations. On May 24, 1993, defendant informed plaintiff that the contract was terminated. By letter dated June 3, 1993, defendant rescinded the termination letter. Plaintiff was informed in the letter that it had fifteen days in which to submit a plan to the EPA indicating how the remaining work was to be performed in order to comply with local, state and federal regulations.
By letter to Office of the State Architect Engineer, dated June 17, 1993, plaintiff indicated that it "recently noticed appropriate authorities that the work would recommence on Monday June 21, 1993." Also during this time, defendant notified plaintiff that it wanted the plan to include dry asbestos removal procedures. On June 29, 1993, the EPA received a revised work plan from plaintiff, and the EPA lifted the cease and desist order on July 1, 1993; however, because of the unavailability of Chryatech to be back on the site on that date, work did not resume until July 13, 1993.
On August 18, 1993, plaintiff submitted change order request No. 9, seeking $51,224.04 in additional compensation. Plaintiff asserted that the change order request "is directly attributable to the improper shutdown of this project by the State of Ohio, their requirement to leave equipment in place, and to delays in restarting the project."
The trial court made the following findings regarding plaintiff's claim for damages for the delay on the project from May 13, 1993 through July 12, 1993:
 * * * [T]he EPA issued a cease and desist order on May 13, 1993, due to several violations regarding asbestos abatement procedures. The EPA required an amended work plan to be issued before work could proceed. In response to the issuance of the cease and desist order, defendant terminated the contract with plaintiff on May 24, 1993. In an effort to give plaintiff a second chance on the project, defendant rescinded the termination notice on June 3, 1993. Plaintiff then proceeded to form an amended work plan and submitted it to defendant on June 21, 1993. However, defendant wanted the plan to include dry asbestos removal for some portions of the project. Therefore, plaintiff submitted a revised amended work plan to defendant and the EPA on June 29, 1993. The EPA accepted the work plan and lifted the cease and desist order on July 1, 1997. Since Chryatech, Inc. was performing work elsewhere, the project was further delayed until July 12, 1993. The delay lasted a total of sixty-one days. Plaintiff contends that defendant is responsible for the delay and is therefore liable for the costs that are associated with it.
 The court finds that both plaintiff and defendant caused the sixty-one day delay. In fact, the portion to which each contributed to the delay is almost identical. Due to safety violations, plaintiff was the initial cause of the delay. However, defendant became responsible for a portion of the delay when it wrongfully terminated the contract with plaintiff. Once defendant placed the additional requirement of dry asbestos removal, it became responsible for the delay. Since defendant's representative was not available once the cease and desist order was lifted, defendant is responsible for the delay during that period.
 In light of the foregoing, the court finds that defendant is responsible for twenty-eight days of the sixty-one day delay. Therefore, the court finds that defendant owes an apportioned share of plaintiff's costs incurred during the delay period. The delay period caused plaintiff to incur an equipment expense of $51,244. Accordingly, defendant's apportioned share of such costs is $23,572.* * *
In general, "[w]here both parties contribute to the delay 'neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.'" Blinderman Const. Co., Inc. v. United States
(Fed. Cir. 1983), 695 F.2d 552, 559. Thus, "courts will deny recovery where the delays are 'concurrent or intertwined' and the contractor has not met its burden of separating its delays from those chargeable to the Government." Id.
As stated above, plaintiff contends that the trial court's finding of twenty-eight total days of delay attributed to defendant was erroneous, and that defendant was actually responsible for thirty-six days of delay. Initially, we note that the discrepancy, as to at least one day, appears to arise from the fact that plaintiff computes the period of time between the termination and subsequent rescission of the contract (from May 24, 1993, through July 3) as an eleven day period, whereas the trial court computed this period as ten days. We find no error in the trial court's computation.
Plaintiff also attributes a period of delay to defendant beginning on June 18, 1993, based upon plaintiff's contention that defendant imposed the dry asbestos requirement no later than that date. However, as noted above, the record indicates that plaintiff was required to submit an amended work plan with the EPA. Plaintiff's letter to the Office of the State Architect Engineer indicates that "Masterclean will be available at a mutually agreed date and time anytime during the week of June 21, 1993." Consistent with this evidence, the trial court appears to have calculated the delay for which defendant was solely responsible as beginning on June 21, 1993, rather than on June 18. We note that, despite the requirement imposed by defendant for dry asbestos removal, plaintiff's own proposed findings of fact submitted to the trial court did not suggest a delay period beginning on June 18; rather, plaintiff asserted that the state "must be held responsible for any delay in recommencement of the work after June 21, 1993." At trial, plaintiff's witness, John Buford, testified that plaintiff "forwarded revised notifications" to the EPA regarding its work plan on June 21. (Tr. 318.) Upon review, we find no error in the trial court's calculation of delay based upon the June 21 date.
Plaintiff further contended, in its proposed findings of fact, that its responsibility for delay in the project "is limited to the period from June 3 to June 21, 1993, to wit: 18 of the 61 day delay." The trial court, however, in finding that plaintiff's own actions resulted in the EPA issuing the cease and desist order, attributed a portion of delay to plaintiff which included the time frame starting with the issuance of the cease and desist order on May 13, and which, as to that particular period, continued until the date defendant terminated the contract. We find no error in the trial court's failure to award plaintiff an adjustment for this time period where the evidence indicates that plaintiff was responsible for the circumstances leading to the cease and desist order.
Upon review of the record, we conclude that the trial court's apportionment of delay and calculation of an equitable adjustment was not against the weight of the evidence. Plaintiff's sixth assignment of error is without merit and is overruled.
Plaintiff's seventh assignment of error involves a related claim arising out of the sixty-one day shut down period. Specifically, this assignment of error concerns plaintiff's claim that the length of the delay required plaintiff to perform costly repeat work due to deteriorating conditions in the tunnels during that period.
Plaintiff asserted in a letter to Chryatech that damage occurred during the two- month delay because of various factors, including steam and heat in the tunnels, as well as "[r]accoons and cats, and probably non-Masterclean persons." At trial, plaintiff attempted to show, through the testimony of its employee Buford, that a short interruption of work would not have resulted in any deterioration. This evidence consisted of plaintiff's counsel asking Buford on direct examination whether he believed that a short delay of "say, two weeks," would have resulted in the need to perform the extra work. Buford responded, "I would say no." (Tr. 184.)
The trial court determined that defendant was not responsible for such loss, based on the court's finding that "such deterioration would have as easily taken place in thirty-three days as it did in sixty-one." Plaintiff argues that the court's analysis "necessarily assumes that Masterclean was wholly responsible for the first 33 days of delay." Plaintiff argues that the evidence indicates that, due to defendant's termination of the contract on May 24, 1993, which was not rescinded until June 3, 1993, defendant was responsible for eleven of the first twenty-one days of delay.
However, as previously noted, following the EPA's issuance of the cease and desist order, resulting in a shut down on May 13, plaintiff was required to respond with an amended work plan that complied with the applicable law. Plaintiff subsequently filed its initial work plan with the EPA, and indicated it was ready to proceed on June 21, 1993. Accordingly, despite the fact defendant terminated the contract for a ten-day period from May 24 through June 3, plaintiff's contention that, but for the termination it is "apparent it would have recommenced" the work in as little as two weeks, is dubious. Further, the thrust of plaintiff's evidence on the effect of a two-week delay was Buford's statement that he did not think that a delay of "say, two weeks" would have resulted in any deterioration. The trial court apparently afforded little weight or relevance to this testimony. Given the limited, speculative nature of the testimony, and where the evidence indicates that the initial delay, resulting in the issuance of the cease and desist order, was precipitated by plaintiff's work practices, we find that the trial court did not err in denying plaintiff's "deterioration" claim.
Plaintiff's seventh assignment of error is overruled.
Under the eighth assignment of error, plaintiff asserts that the trial court erred in denying a change order request seeking compensation for the theft of equipment at the Western Reserve site.
The facts surrounding this claim indicate that, during the shut down period from May 13, 1993, through July 13, 1993, plaintiff secured its equipment in a trailer on the Western Reserve site. Upon returning to the work site on July 13, plaintiff discovered that equipment from the trailer had been stolen. There was testimony that the trailer had been locked prior to the theft and that there was no sign of forced entry into the trailer. Plaintiff subsequently sought reimbursement from defendant for the cost of the stolen equipment.
Plaintiff's claim is based on the contention that it was ordered to leave the site following the cease and desist order issued by the EPA. Plaintiff argues that defendant restricted access to the hospital site and instructed plaintiff that, if it attempted to return to the scene, law enforcement officers would be notified.
The trial court found in favor of defendant on the stolen equipment claim. Specifically, the court found that, during the shut down period, plaintiff had the opportunity to retrieve its equipment but failed to request permission from defendant to do so. The court also found that, while the contract required plaintiff to insure its property, plaintiff had failed to obtain adequate coverage.
Plaintiff's main contention is that defendant restricted its access to the site, thereby allowing the theft of equipment. However, the record indicates there was evidence before the trial court that plaintiff had the opportunity to remove its equipment upon request. Plaintiff's Exhibit No. 99, a letter from Herman Wong, a project manager with the Ohio Department of Mental Health, to Tim Carmichael, the superintendent at Western Reserve, stated that plaintiff's employees were not to come onto the Western Reserve grounds "without prior permission from Central Office and the State Architect's Office." The letter further stated, in part:
 * * * [W]e would be willing for them to remove their equipment but only under the following conditions:
1. They make their request ahead of time;
 2. They come on a date and time mutually agreeable to Chryatech, Tim Reder, and you;
 3. On the day involved, that the above individuals accompany Masterclean, and
 4. An inventory be taken of what they remove, with copies to all parties.
 Masterclean will not be permitted to remove any enclosure setups, nor any air sampling equipment, nor any bags of asbestos waste.
At trial, Wong testified that the letter was drafted because plaintiff's employees were observed on the Western Reserve grounds after the cease and desist order was issued. Wong further testified that, despite the opportunity for plaintiff to seek permission to come onto the site and remove equipment, no such request was ever made. Thus, while plaintiff contended at trial that its workers were not allowed on the site during the shut down, there was evidence before the court indicating that provision was made for plaintiff's employees to remove the equipment, but that plaintiff declined to seek permission to do so. We conclude that there was credible evidence supporting the trial court's finding that plaintiff had "ample time and opportunity to enter the Western Reserve site and retrieve its equipment."
Regarding the trial court's finding that plaintiff failed to adequately insure its equipment, the specifications provide that "[e]ach Contractor shall maintain insurance to protect itself and/or the State from loss incurred by * * * theft * * * in the full amount of the Contract and such insurance shall cover all labor and materials connected with the work." Plaintiff's witness, Buford, testified that plaintiff had insurance, but the company experienced difficulty recovering from the insurance company because the deductible was too high. Plaintiff's president also acknowledged that many of the missing equipment items were not covered because of the deductible. The trial court's findings on the stolen equipment claim are supported by credible evidence and will not be disturbed on appeal.
Plaintiff's eighth assignment of error is overruled.
Plaintiff's ninth and tenth assignments of error are interrelated and will be considered together. These assignments of error pertain to a deduction made in the amount paid to plaintiff as a result of defendant's decision to hire another abatement contractor, Cardinal Environmental ("Cardinal"), to provide certain services following the EPA shutdown.
Cardinal performed services at the Western Reserve facility from April 24, 1993 through April 28, 1993. Cardinal submitted an invoice for $16,882.28, and the company was paid $15,200 for the work.
In addressing the issue of the deduction, the trial court found in favor of defendant, holding in part:
 Upon the issuance of the cease and desist order by the EPA, plaintiff was required to stop working until an amended work plan was submitted. However, the Western Reserve site needed to be sealed off to prevent contamination of the entire site. Accordingly, defendant took bids to seal the project. Defendant entered into a contract with Cardinal * * * to perform the work.
 The court finds that defendant acted reasonably in retaining Cardinal to seal the project. When the EPA issued the cease and desist order, the site had been contaminated. Plaintiff's wrongful removal practices caused the shutdown. The cleanup was costly due to its high risk and because it was performed at the last minute. Cardinal stopped other projects to seal the Western Reserve site. Due to the extenuating circumstances, the court finds that the cost of Cardinal's services was reasonable. Additionally, the court finds that Cardinal performed work that would have normally been performed by plaintiff had the site not been contaminated. Accordingly, it was proper for defendant to deduct the cost of such services from the amount owed to plaintiff under the contract. Therefore, the court finds in favor of defendant for the deduction of costs for Cardinal's services.
Upon review of the record, we find that there was an evidentiary basis for the trial court to conclude that defendant acted reasonably in hiring Cardinal to perform emergency clean up work following the EPA shut down. Beaupre testified regarding the decision to hire Cardinal to perform abatement work at the Western Reserve site. According to Beaupre, at the time the EPA stopped work on the site, "abatement had been in progress, and in one of the work areas * * * the asbestos was partially exposed * * * and was drying out." (Tr. 820.) Beaupre stated that, because of the location of the work, Chryatech deemed it advisable to have another contractor come to the site, wet the material, remove it and clean the area. He stated that, in another tunnel, "it was discovered that there were several asbestos-contained pipe insulation fittings that had not been removed." (Tr. 821.) In order for employees at the mental health site to pass through that area and obtain access to the facility, the fittings needed to be removed and air testing performed.
Beaupre stated that the purpose of hiring Cardinal was to deal with those risks and to "button down" or stabilize the project site. As noted above, Cardinal was paid $15,200 for its work. According to Beaupre, the amount paid to Cardinal reflected in part the fact that the contractor was taken out of its regular schedule and was "being asked to mobilize rather rapidly." (Tr. 895.) There was competent, credible evidence to support the trial court's findings that defendant acted in a reasonable manner in hiring the services of Cardinal under the circumstances at issue, and we conclude that the trial court did not err in denying plaintiff's deduction claim.
Plaintiff's ninth and tenth assignments of error are overruled.
Under the eleventh assignment of error, plaintiff asserts that the trial court erred in failing to grant prejudgment interest. Plaintiff argues that it is entitled to prejudgment interest on all of its claims for which the state is found liable, citing in support the Ohio Supreme Court's decision inRoyal Elec. Constr. Corp. v. Ohio State Univ. (1995), 73 Ohio St.3d 110.
In Royal, the court held in the syllabus:
 In a case involving breach of contract where liability is determined and damages are awarded against the state, the aggrieved party is entitled to prejudgment interest on the amount of damages found due by the Court of Claims. The award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court. (R.C. 2743.18[A] and 1343.03[A], construed and applied.)
In its brief, defendant concedes that plaintiff "is legally correct that, by statute and Supreme Court case law, a contractor who prevails on a claim is entitled to prejudgment interest from the date of substantial completion of the project until judgment." Defendant argues, however, that the trial court's decision is silent as to the issue of prejudgment interest and that plaintiff had the opportunity to correct this omission by reopening the judgment entry at the trial court level. Defendant thus argues that plaintiff has waived the right to appeal this issue. We disagree.
As noted by defendant, the trial court's decision (as well as the judgment entry) contains no reference to the issue of prejudgment interest; however, in its complaint, plaintiff's prayer for relief requests interest against defendant. Further, in plaintiff's proposed findings of fact and conclusions of law, plaintiff again raised the issue under a section addressing "prejudgment interest findings." Based upon the record in this case, we find that plaintiff properly raised the issue of prejudgment interest and we reject defendant's waiver argument. Accordingly, we conclude that plaintiff is entitled, by statute, to prejudgment interest, and that this matter must be remanded to the trial court for a determination of the amount of prejudgment interest owed to plaintiff.
Plaintiff's eleventh assignment of error is sustained.
Based upon the foregoing, plaintiff's first, second, third, fourth, fifth, sixth, seventh, eighth, ninth and tenth assignments of error are overruled, plaintiff's eleventh assignment of error is sustained, the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part and reversed in part; causeremanded.
LAZARUS, P.J., and KENNEDY, J., concur.