**N.R. ACQUISITION CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–338 C.**

United States Court of Federal Claims.

May 14, 2002.

Patrick A. Genzler, Norfolk, Virginia, for the plaintiff.

Armando O. Bonilla,[1] Washington, D.C., with whom were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, James M. Kinsella, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the defendant. Theodore R. Pixley, Jr., Defense Logistics Agency, Defense Reutilization and Marketing Service and Robert E. Lieblich, John B. Dale, and Susan S. Grooms, Naval Sea Systems Command, of counsel.

**OPINION & ORDER**

BUSH, Judge.

Currently before this court is the defendant's Motion for Summary Judgment Based

---

**1.** As of July 13, 2001, *Brian A. Mizoguchi*, Washington, D.C., with whom were *Robert D. McCallum, Jr.*, Assistant Attorney General, *David M. Cohen*, Director, *James M. Kinsella*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the defendant.

upon the Asserted Special Plea in Fraud filed March 29, 2001; Plaintiff's Cross–Motion for Summary Judgment Dismissing Defendant's Counterclaim filed October 3, 2001; and Defendant's Request for Leave to File Supplemental Material Pertaining to the Court's Question Concerning *United States v. Ellis*, filed April 9, 2002. For the following reasons, each of these respective motions is denied.

## BACKGROUND

### I. Factual Background

Following is an overview of the facts of this case. Plaintiff is N.R. Acquisition Corporation (NRAC), a Nevada corporation whose principal place of business is New York City. On May 7, 1993, the Department of Defense, Defense Reutilization and Marketing Service (DRMS) awarded NRAC Sales Contract No. 31–3359–009 for the demilitarization, scrapping, and disposal of the decommissioned Naval aircraft carrier, the U.S.S. Coral Sea (the Coral Sea).[2] The Coral Sea was 979 feet long, had a 238 foot beam, a 35 foot draft, and stood approximately 145 feet from the keel to the top level of the "island" atop the flight deck.

Under the terms of the contract, NRAC was to pay DRMS a fixed price amount of $748,999 for the rights to scrap the Coral Sea. NRAC was to perform the scrapping in accordance with the terms of the contract requiring compliance "with all applicable Federal, State and Local laws, ordinances, regulations, etc., with respect to human safety and the environment during the processing, use or disposal of material purchased from the Department of Defense . . ." Defendant's Appendix at 292. Then, presumably, NRAC would be able to sell the scrap materials from the vessel to recover the sum paid to DRMS, recover its costs of scrapping and disposal, and hopefully turn a profit. The

contract specified dates by which demilitarization of certain ordnance equipment was to be accomplished and specified a date by which scrapping of the vessel was to be completed. NRAC was required to provide monthly progress reports to DRMS. DRMS inspected work at the facility of NRAC's scrapping subcontractor to ensure compliance with the contract specifications concerning disposal of certain equipment from the vessel. DRMS retained authority to terminate the contract for default if NRAC failed to comply with contract specifications.

The invitation for bids (IFB) incorporated into the contract notified bidders that there were items aboard the vessel containing polychlorinated biphenyls (PCBs), toxic substances regulated under federal, state, and local law. The IFB also informed bidders that the Coral Sea might contain asbestos. Pursuant to the IFB, NRAC was required to inspect the Coral Sea prior to bidding. NRAC retained a contractor, American General Resources, to inspect the Coral Sea prior to submitting its bid. According to plaintiff, it was not permitted to conduct any sampling of materials aboard the vessel, or similar intrusive investigations.

On March 30, 1993, NRAC was notified that it was the highest responsible bidder; the contract was awarded on May 7, 1993; and NRAC took possession of the Coral Sea on or about July 5, 1993. NRAC then subcontracted the work of scrapping the Coral Sea to Seawitch Salvage, Inc. (Seawitch; Seawitch Salvage) of Baltimore, MD. The ship was towed to a facility leased by Seawitch in Baltimore, and Seawitch commenced scrapping the vessel in August, 1993.

NRAC or its subcontractors tested the ship for PCB contamination as part of the planned schedule of work. NRAC states that further testing of the Coral Sea uncovered contamination not previously known to

---

**2.** The Coral Sea was launched April 2, 1946 by Newport News Shipbuilding and Drydock Co., Newport News, VA; was commissioned on October 1, 1947; and then reported to the Atlantic Fleet. DICTIONARY OF AMERICAN NAVAL FIGHTING SHIPS, Office of the Chief of Naval Operations, Naval History Division, Washington, USS *Coral Sea* (CVB–43). She later set sail for her tours of duty in the Mediterranean with the 6th Fleet, where

she brought "her impressive strength to the 6th Fleet in its important role as guardian of peace" in the region. *Id.* Throughout her history, the Coral Sea participated in North Atlantic Treaty Organization exercises; evacuated American Citizens from troubled areas; carried numerous high-ranking dignitaries and government officials; and trained pilots in carrier operations. *Id.*

NRAC or its subcontractors. Fluids and items that were confirmed as having regulated levels of PCBs were allegedly segregated, properly stored, and disposed of by NRAC.

NRAC alleges that during the scrapping of the Coral Sea it learned there was substantially more asbestos material on board the vessel than was represented in the IFB. NRAC also states that shortly following the commencement of the contract, Seawitch Salvage began experiencing financial problems stemming from the unanticipated costs of remediating hazardous materials aboard the Coral Sea and the alleged failure of DRMS to deliver plans of the vessel.

In October 1994, NRAC contacted DRMS and requested authorization to sell the demilitarized and partially scrapped Coral Sea to an Indian purchaser. The contract, as written, required that the scrapping take place in the United States, Puerto Rico, or the Virgin Islands. DRMS delineated several requirements that NRAC was to meet in order for DRMS to issue such a contract modification. Despite NRAC's attempts to satisfy these requirements and following much negotiation, DRMS ultimately concluded that it would not permit NRAC to transport the Coral Sea to India. Plaintiff states that by letter dated December 15, 1995, DRMS notified NRAC of its refusal to modify the contract to permit export of the Coral Sea hull.

With the approval of DRMS, during 1995, NRAC terminated its subcontract with Seawitch Salvage and replaced it with a new subcontractor, Kersand Corporation, of Glen Burnie, MD. Then in 1996, also with the approval of DRMS, NRAC terminated its subcontract with Kersand Corporation and replaced it with a new subcontractor, Patapsco Recycling, LLC, of Baltimore, MD.

On March 12, 1996, NRAC submitted a claim for $8,871,416 to the contracting officer, claiming government-responsible changes to the contract. In this claim, NRAC set forth costs associated with its preparation for towing the hull of the Coral Sea to the Far East in the amount of $3,726,416. Plaintiff contends these claims have since grown to $4,816,416. NRAC further argues that the government, through DRMS and the U.S. Navy, "negligently and inaccurately per-formed a PCB survey of the Coral Sea and thereby provided NR[A]C with defective information regarding the presence of PCB's aboard the ship." Compl. ¶ 37. In its March 12, 1996 claim, NRAC contended that this allegedly defective information caused NRAC to incur over $200,000 in additional costs for remediating PCBs on the vessel. In its complaint, NRAC alleges that considering additional indirect costs arising from the same claim item the costs of PCB remediation have grown to $500,000. NRAC also contends that the government, through DRMS and the U.S. Navy, had extensive information regarding the presence of asbestos materials aboard the Coral Sea but failed to disclose this information to NRAC. NRAC contends that the alleged failure to disclose this asbestos contamination was a constructive change and caused NRAC to incur over $500,000 in additional costs of performance to remediate asbestos beyond those costs described in the invitation for bids or marked aboard the vessel. NRAC contends that the amount of this claim had increased to $1,000,000 at the time it filed the complaint due to additional asbestos removal.

NRAC asserts it sustained further losses from DRMS's failure to permit NRAC to export the hull of the Coral Sea to the Far East based on Northern Marine, L.L.C.'s (Northern Marine) inability to obtain financing for another contract. Northern Marine is managed and controlled by the same management that owns and controls NRAC. NRAC argues that the reputations of NRAC and Northern Marine were both severely damaged by the failure to complete the Coral Sea contract in accordance with the constructive changes to the contract and, accordingly, NRAC was deprived of profits it would have gained from the award of a different but similar contract to Northern Marine. NRAC assesses the losses from this contract to be $4,385,000 ($165,000 for the deposit; $150,000 on development; and $4,070,000 on lost profits).

In sum, NRAC alleges that, as a result of the changes directed by DRMS, it incurred additional costs of performance for work on the Coral Sea contract; costs associated with the preparation of the Coral Sea for export;

and costs on related contracts totaling $10,701,416.

In a May 17, 1996 letter, the contracting officer concluded that NRAC was not entitled to recovery, and denied NRAC's claim.

On September 24, 1996, Seawitch Salvage and its former owner/President, Kerry L. Ellis, Sr., were indicted by a Federal grand jury sitting in the United States District Court for the District of Maryland (Baltimore) for the alleged commission of myriad criminal acts directly linked to NRAC's performance of the scrapping of the decommissioned Naval aircraft carrier. The criminal charges in the indictment include:

a. stripping, removing, and disposing of friable asbestos in violation of the Clean Air Act and the National Emission Standards for Hazardous Air Pollutants, 42 U.S.C. § 7413(c)(1) (1996);

b. making false statements to DRMS, in violation of 18 U.S.C. § 1001 (1996), that licensed contractors had performed the asbestos removal when, in fact, the hazardous material was removed by unlicensed Seawitch employees;

c. dumping a harmful quantity of oil into United States waters in violation of the Clean Water Act, as amended by the Oil Pollution Act of 1990, 33 U.S.C. §§ 1319(c)(2)(A) and 1321(b)(3) (1996);

d. dumping pollutants (*e.g.*, construction debris, paint chips, metal fragments, and insulation materials) into United States waters without a permit in violation of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A) (1996); and

e. dumping refuse (*e.g.*, dirt, tires, bricks, and wood) into navigable waters of the United States without a permit in violation of 33 U.S.C. §§ 407 and 411 (1996).

Defendant's Motion at 9 (citing Defendant's Appendix at 219–31).

Mr. Ellis and Seawitch were prosecuted and found guilty of all charges. Mr. Ellis was sentenced to a 30–month prison term and fined $50,000. Seawitch was placed upon probation for a period of five years and fined $50,000. Final judgment was entered by the federal district court in this criminal case on February 17, 1998. The criminal convictions of Mr. Ellis and Seawitch were affirmed by the United States Court of Appeals for the Fourth Circuit on February 22, 1999. *United States v. Ellis*, 172 F.3d 864 (4th Cir.1999) (Table) (*per curiam*). The parties dispute which of these convictions relate to the case at bar. On July 29, 2000, Mr. Ellis died.

On February 14, 2000, following the issuance of a cure notice, DRMS terminated its contract with NRAC for default. The contracting officer issued a second final decision on March 14, 2000, upholding NRAC's termination. Among the stated bases for the default termination were NRAC's alleged failure to meet scrapping milestones and its failure to demonstrate its ability to complete the project. On or about April 26, 2000, NRAC appealed its default termination to the Armed Services Board of Contract Appeals. That action is currently pending.

## II. Procedural History

The government filed a motion to dismiss, or in the alternative, for summary judgment, or in the alternative, for partial summary judgment on February 18, 1998. Sr. Judge Robert J. Yock heard oral argument on these motions on October 16, 1998. On October 19, 1998, he issued an opinion denying the motions without prejudice wherein he stated:

> Since there appears to this Court to be significant factual matters yet to be resolved, the Court will deny the motion at this juncture. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir. 1983). This case simply needs further factual ventilation.

*N.R. Acquisition Corp. v. United States*, No. 97–338C, slip op. at 2 (Fed.Cl. Oct. 19, 1998).

On January 29, 1999, the government filed its answer to the complaint. This case was reassigned to the undersigned on February 4, 1999. On March 29, 2001, the government filed its motion: (1) to file an amended answer to assert affirmative defenses and a counterclaim based upon a special plea in fraud; (2) for summary judgment based upon the asserted special plea in fraud; and (3) for

a protective order. On May 14, 2001, plaintiff filed its response to defendant's motion to file an amended answer and counterclaim based upon a special plea in fraud. Plaintiff filed its response to defendant's motion for protective order on May 15, 2001. On June 4, 2001, the government filed its combined reply to plaintiff's response to defendant's motions: (1) to file an amended answer to assert affirmative defenses and a counterclaim based upon a special plea in fraud; and (2) for a protective order. On June 22, 2001, this court issued an order wherein it: (1) granted defendant's motion to file an amended answer to assert affirmative defenses and a counterclaim based upon a special plea in fraud; and (2) granted defendant's motion for a protective order and suspended discovery in this case pending the court's resolution of the government's motion for summary judgment. Accordingly, on June 22, 2001 defendant's first amended answer was filed. On October 3, 2001, plaintiff filed its response to defendant's motion for summary judgment based upon the special plea in fraud and its cross-motion for summary judgment dismissing defendant's counterclaim. On November 9, 2001, defendant filed its reply to plaintiff's response to defendant's motion for summary judgment based upon the asserted special plea in fraud and defendant's opposition to plaintiff's cross-motion for summary judgment dismissing defendant's counterclaim. On January 14, 2002, plaintiff filed its reply to defendant's opposition to NRAC's cross-motion for summary judgment dismissing defendant's counterclaim.

In its order of February 15, 2002, the court ordered oral argument on the pending motions. The court ordered the parties to be prepared to discuss: (1) whether plaintiff's claims are pass-through claims on behalf of Seawitch; (2) whether before or during contract performance plaintiff was aware or had reason to believe that Seawitch was not an asbestos contractor duly licensed in Maryland; and (3) whether during contract performance plaintiff was aware of Seawitch's activities related to the contract at issue that were the subject of the criminal conviction in *United States v. Ellis,* 172 F.3d 864 (Table) (4th Cir.1999). The oral argument was scheduled for April 11, 2002. On April 9, 2002, the court received in chambers a hand-delivered courtesy copy of Defendant's Request for Leave to File Supplemental Material Pertaining to the Court's Question Concerning *United States v. Ellis,* filed April 9, 2002. The supplemental material included a discussion of testimony from the trial of Ellis and Seawitch, proffered to establish NRAC's responsibility for and knowledge of Seawitch's activities, filed April 9, 2002. Also on April 9, 2002 the court received via facsimile a courtesy copy of Plaintiff's Opposition to Defendant's Request for Leave to File Supplemental Material, filed April 11, 2002. On April 10, 2002, the court cancelled the oral argument previously scheduled for April 11, 2002 on the grounds that in view of the dispute concerning supplementation of the defendant's motion for summary judgment oral argument was no longer appropriate. On April 11, 2002, the court held a status conference in which both parties participated.

## DISCUSSION

### I. Jurisdiction

The court has jurisdiction over this matter pursuant to the Contract Disputes Act, 41 U.S.C. § 609(a)(1) and the Tucker Act, 28 U.S.C. § 1491(a).

### II. Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c) of the United States Court of Federal Claims. It is designed to ensure the " 'just, speedy and inexpensive determination of every action....' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Federal Rule of Civil Procedure 1). The non-moving party must " 'do more than simply show that there is some metaphysical doubt as to the material facts' " to defeat a motion for summary judgment. *Good v. United States,* 39 Fed.Cl. 81, 94 (1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). Summary judgment is not appropriate where

there are disputes over facts that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Thus, summary judgment will not be granted if "the dispute about a material fact is 'genuine.' " *Id.*

In making a determination as to whether genuine issues of material fact exist, the court is not to accept a party's bare assertion that a fact is in dispute. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835–36 (Fed.Cir.1984). The party opposing the motion must "point to an evidentiary conflict created on the record by at least a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." *Id.*

In cases where both parties have moved for summary judgement, as they have in this case, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987). In resolving cross-motions for summary judgment, the court may not weigh the evidence and determine the truth of the matter. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

## III. Defendant's Motion for Summary Judgment Based upon the Asserted Special Plea in Fraud and Plaintiff's Cross–Motion for Summary Judgment Dismissing Defendant's Counterclaim

### A. The parties' arguments

#### 1. The government's argument

The government argues that the entirety of plaintiff's claims should be forfeited based on 28 U.S.C. § 2514. This statute provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find fraud or attempt and render judgment of forfeiture.

In support of its argument, the government alleges that during the course of contract performance, Seawitch Salvage, NRAC's scrapping contractor, dumped PCB contaminants, asbestos, and other hazardous materials into the Baltimore Harbor in violation of myriad Federal and state laws. It also argues that NRAC hired Seawitch, an unlicensed asbestos removal contractor, to remove the asbestos from the Coral Sea.

The government contends these violations occurred despite the fact that NRAC was on actual, written notice that (1) the decommissioned Naval aircraft carrier it bid to scrap and dispose of contained PCB contaminants, friable asbestos, and other hazardous and toxic materials; (2) NRAC was responsible for disposing these hazardous materials in "strict compliance" with all Federal and state laws; and (3) NRAC was required to hire only licensed asbestos contractors to perform the asbestos removal. The government points to the following provisions in the invitation for bids mandating "strict compliance" with all Federal and state laws in handling PCB contaminants, asbestos, and other hazardous and/or toxic materials aboard the vessel:

a. *Regulated Substances:* PCB, asbestos, or other hazardous or toxic item(s) or components not identified in the item description may remain on the vessel being offered in this Invitation for Bid. Strict adherence to Federal environmental statutes, U.S. Environmental Protection Agency (EPA) regulations, state and local environmental laws and regulations are required for this item. Purchaser is cautioned that it is solely responsible to ascertain the extent to which Federal environmental laws and other state and local statutes and regulations may effect it and comply therewith.

b. *Environmental Protection:* All bidders are advised that they must comply with all applicable Federal, State, and Local laws, ordinances, regulations, etc., with respect to human safety and the environment during the

processing, use or disposal of material purchased from the Department of Defense. . . .

c. *PCB Items:* . . . The Purchaser shall be responsible for handling and disposing of all items containing PCB contamination in quantities regulated under applicable Federal, State, and Local laws and regulations. . . .

d. *Asbestos:* . . . The purchaser shall be responsible to remove and dispose of all Asbestos in accordance with Federal, State, and Local laws and regulations.

Defendant's Appendix at 292–94.

In further support of its motion, the government points out that NRAC was required to submit a technical plan detailing the manner in which NRAC would scrap the Naval aircraft carrier at issue. And in its April 7, 1993 submission that was incorporated into the parties' contract, NRAC represented to DRMS that all asbestos work would be subcontracted to, and performed by, an asbestos contractor duly licensed in Maryland. Yet, the government contends, unlicensed Seawitch employees performed the asbestos removal at the direction of Seawitch's owner/president in violation of the terms of the parties' contract.

On September 24, 1996, Seawitch and its former owner/president, Kerry L. Ellis, Sr., were indicted by a Federal grand jury sitting in the United States District Court for the District of Maryland (Baltimore) for the alleged commission of myriad criminal acts directly linked to NRAC's performance of the scrapping of the decommissioned Naval aircraft carrier. The criminal charges in the indictment, all of which Seawitch and Mr. Ellis were convicted of, are set forth in the factual background, *supra*.[3]

The government contends that whether NRAC encouraged these criminal activities or "simply turned a blind-eye," the end result is the same and the plaintiff's claims should be forfeited in their entirety. This is so, defendant argues, because when fraud has infected any aspect of contract performance, contract claims cannot be parsed, nor recov-

ered upon even if not directly connected to the fraudulent activity.

In support of its argument, the government relies primarily on *Supermex, Inc. v. United States,* 35 Fed.Cl. 29 (1996), wherein the court broadly interpreted the scope of Section 2514's applicability. In this case, the court found that the statute's application is not limited to simply the " 'presentment of a claim,' " but also includes fraud " 'intrinsic to the claim.' " *Supermex,* 35 Fed.Cl. at 40 (quoting *Brown Constr. Trades, Inc. v. United States,* 23 Cl.Ct. 214, 216 (1991)). The defendant relies on language in *Supermex* that states: "[T]he mandate of the words employed in 28 U.S.C. § 2514 [are] clear and unequivocal. The words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during contract performance." *Supermex,* 35 Fed.Cl. at 39–40.

A critical underpinning of the government's argument is that the criminal acts for which Seawitch stands criminally convicted are imputed to NRAC. The crux of its argument in this regard is as follows:

[W]here, as here, the record presented demonstrates a 'causal link' between an illegal or fraudulent act and the provisions of the contract in issue, the requisite 'taint' is established, subjecting the contractor's putative claims to forfeiture . . . This is so regardless of whether: (1) the illegal or fraudulent acts were engaged in by the contractor or, as in this case, its subcontractor; or (2) the contractor was aware of its subcontractor's illegal or fraudulent acts.

Defendant's Motion at 24 (citations omitted).

### 2. The plaintiff's argument

The plaintiff contends that the government's motion for summary judgment should be denied because the alleged violations of environmental law by Seawitch and its president, standing alone, do not constitute "fraud" within the meaning of the Special Plea in Fraud statute, 28 U.S.C. § 2514. It is plaintiff's position that any alleged violations by Seawitch or Ellis are not "fraudu-

3. The parties dispute which of these violations are germane to the instant lawsuit.

lent" because the "intent" element of 28 U.S.C. § 2514 and the underlying offenses of which Seawitch and Ellis were convicted are substantively different, as the criminal environmental offenses do not require specific intent. Plaintiff states that:

> The Government seeks to set up the syllogism that a subcontractor's violation of environmental regulations or conviction of violating environmental laws equals fraud within the meaning of the Special Plea in Fraud statute. That is simply not the law. If it were, virtually every instance of noncompliance with environmental regulations on any government contract would be "fraud" since virtually all government contracts require such compliance.

Plaintiff's Response at 6.

Plaintiff further contends that the government's motion for summary judgment should be denied because there are disputed issues of material fact, and the conviction of a subcontractor, over its pleas of not guilty to environmental violations, does not preclude NRAC's litigation of issues relating to fraud. Plaintiff argues that because NRAC was not a party to the *Ellis* case it is not estopped by collateral estoppel or the principles of imputing actions of corporate officers to the corporation from challenging the factual underpinnings of that decision.

The plaintiff also argues that *Supermex*, along with the other cases presented by the government, fails to support the proposition that the conviction of a third party subcontractor, over its guilty pleas, estops the prime contractor from contesting a government counterclaim based on alleged fraud. It also attempts to distinguish other cases cited in the government's brief and contends that those cases do not stand for the proposition that the criminal conduct of a subcontractor is imputed to the prime contractor.

Plaintiff further argues that the government's motion for summary judgment should be denied because the government has contributed to the environmental violations allegedly committed on the project by its own violations of applicable federal regulations regarding asbestos and other hazardous substances, and by its prior breaches of the contract with NRAC.

In support of its cross-motion the plaintiff contends that it is entitled to summary judgment dismissing the government's counterclaim based upon a special plea in fraud because Seawitch's convictions for environmental crimes do not satisfy the requisite elements of the Special Plea in Fraud statute, 28 U.S.C. § 2514. It further avers that the government's motion and supporting attachments thereto are devoid of any evidence of intent to defraud. Plaintiff also contends that if the government were to prevail on its counterclaim based upon a special plea in fraud the decision would violate the prohibition against excessive fines in the Eighth Amendment to the United States Constitution.

**B. Whether the acts for which plaintiff's subcontractor stands criminally convicted, can be imputed to plaintiff, the contractor, for purposes of the special plea in fraud statute**

The first issue this court must resolve in ascertaining whether it is appropriate to grant summary judgment in favor of the government based on its special plea in fraud is whether the acts for which Seawitch Salvage, NRAC's scrapping contractor, stands criminally convicted are imputed to NRAC.

In its motion for summary judgment, the government essentially fuses two related but analytically distinct propositions into one argument. The first proposition it draws from *Supermex*: Fraud in the performance of one contractual claim by the primary contractor will taint all other claims arising under the same contract because "'[t]he practice of fraud on part of the contract condemns the whole.'" *Supermex*, 35 Fed.Cl. at 40 (quoting *Brown Construction Trades, Inc. v. United States*, 23 Cl.Ct. 214 (1991)). The second proposition is that the criminal acts of a subcontractor during its performance can be imputed to the contractor, thereby precluding the contractor from asserting any of its claims against the government. In its moving brief, the government fuses these two propositions and contends that because Seawitch engaged in some acts for which it

was criminally convicted, it follows that the primary contractor, N.R. Acquisition, is precluded from asserting any of its claims against the government. This conclusion is, however, logically flawed and does not flow either from the case law presented by the government or from any case law of which this court is aware.

■■■ The first proposition may correctly be drawn from *Supermex:* Fraud in the performance of one contractual claim by the primary contractor will taint all other claims arising under the same contract because " '[t]he practice of fraud on part of the contract condemns the whole.' " *Id.* But, significantly, it does not, as the government contends, follow from this limited proposition that fraud on the part of a subcontractor bars all of the contractor's claims.

In *Supermex,* the president of a contracting company committed an act of bribery with a government official. The court found that his acts were imputed to the corporation as he was, without question, acting as the company's president. It stated that "[a] corporation may be held liable for the acts of its officers." *Id.* at 43. Also, the court held the subcontractor could not bring its claims. In support of its conclusion, the court stated that the language of the Special Plea in Fraud statute, 28 U.S.C. § 2514 makes it apparent that a claim against the United States is to be forfeited if fraud is practiced in the performance of the contract. The court stated:

> The Court of Claims has ruled that where fraud is committed in the course of a contract to which the suit pertains, it may not isolate the affected part and allow [the] suit to proceed on the remainder. The practice of fraud on part of the contract condemns the whole...
>
> ... [W]here ... fraud was committed in regard to the very contract upon which the suit is brought, this [C]ourt does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon ... a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.

Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government. *Id.* at 40 (quoting *Brown,* 23 Cl.Ct. at 216) (citation omitted).

The *Supermex* court went on to state that:

> Public policy, congressional intent[,] and case precedent all dictate against condoning any fraud or attempts to practice fraud during the course of contract performance....
>
> ... The [fraud related] guilty plea entered by [the corporation's president] places a stigma upon the contract at issue in this case and on all the claims arising under the contract-in-suit, sufficient to deem plaintiff's claims unenforceable due to public policy considerations.

35 Fed.Cl. at 42.

The government relies strongly on the preceding language and analysis in *Supermex* in support of its conclusion that the subcontractor's (Seawitch) criminal convictions bar the primary contractor (N.R. Acquisition) from asserting the entirety of its claims against the government. This conclusion, however, is incorrect in the view of this court because the *Supermex* court's holding was actually much more limited. The *Supermex* court found that where one claim brought by a primary contractor is tainted with fraud so, too, are the other claims, and accordingly, cannot be pursued against the government. The issue of whether liability can be imputed from a subcontractor to the primary contractor was simply not before the court. Thus, the court's analysis did not touch on the question of whether fraud by a subcontractor functions to taint all of the contractor's claims. Although it is true that in *Supermex* the court also found the subcontractor could not bring its claims based on the contractor's fraud, the court apparently based this conclusion on the fact that the subcontractor did not possess privity to sue the government directly, so its claims could only be brought through the contractor. *Id.* at 44. In this regard, the court stated that "when the prime contractor's claims have been forfeited pursuant to 28 U.S.C. § 2514, it is abundantly clear that [the prime contractor] may not

sue as the plaintiff on behalf of a subcontractor, and the subcontractor is in no position to sue the United States on its own behalf." *Id.* at 44. Accordingly, this holding by the court does not lend support to the government's position in this case.

Although there is language in *Supermex* that on its face appears to support the government's position, the language is drawn out of context because the factual situation before the court in *Supermex* is entirely distinguishable from the situation before this court in the instant case. *Supermex* actually stands, *inter alia,* for the limited proposition that fraud on one claim will be imputed to other claims. It does not stand for the proposition that fraud by a subcontractor will be imputed to a contractor for purposes of a special plea in fraud.

The other cases relied on by defendant in support of its argument that the criminal convictions of a subcontractor should, pursuant to the special plea in fraud statute bar the entirety of plaintiff's claims, also fail to support its argument that NRAC's claims should be dismissed. The government relies upon *Irwin & Leighton v. United States,* 106 Ct.Cl. 398, 65 F.Supp. 794 (1946), *as amended,* 106 Ct.Cl. 398, 65 F.Supp. 800 (1946), in support of its argument. In *Irwin & Leighton,* the subcontractor submitted a bill to the plaintiff for an amount higher than the actual cost of the work performed. In turn, plaintiffs directed a letter to the contracting officer wherein they included the high estimate of the cost of the work. Plaintiffs delivered the letter to the architect for him to submit to the government official. The architect did not deliver the letter to the government official. The subcontractor had knowingly raised the amount to cover money that he had secretly paid to plaintiffs' manager, for good will. Plaintiffs were, however, neither aware of this fact when they presented their bill, nor at the time their petition was filed before the court.

The defendant in *Irwin & Leighton* claimed that plaintiffs should not be entitled to recover based on 28 U.S.C. § 279, 36 Stat. 1141 (the predecessor statute to 28 U.S.C. § 2514). The court agreed, stating that "a fraud was attempted to be practiced against the Government by the parties to the transaction." *Id.* at 799. The court acknowledged that

> [i]t is true that this attempt was made without the knowledge of plaintiffs, but the subcontractor, who is the real party at interest in this time, participated in the attempt and paid the money to plaintiffs' manager... Since the plaintiffs' action on this item is in behalf of the subcontractor, we have no choice but to declare the entire item barred under the plain provisions of the statute.

*Id.*

In its consideration of the parties' motions for new trial, the court affirmed its decision denying recovery on the item that involved the attempted fraud. The court also denied recovery on a second claimed item since both claims arose out of the same contract and were closely linked. *Irwin & Leighton v. United States,* 106 Ct.Cl. 398, 65 F.Supp. 800 (1946).

*Irwin & Leighton* is also distinguishable from the case at bar, however, in that the court emphasized that plaintiffs' claims were pass-though claims on behalf of the subcontractor. In the case at bar, however, neither party has indicated to what extent plaintiff's claims are pass-though claims on behalf of Seawitch. That issue is most significant in the context of this case because there were two subcontractors subsequent to Seawitch who were responsible for the scrapping of the Coral Sea. Moreover, the performance of the contract spanned from May 7, 1993 through February 14, 2000, when the contract was terminated for default, and Seawitch's role as subcontractor was terminated in 1995. Much of the performance of the contract at issue in this case had nothing whatsoever to do with Seawitch or the criminal acts for which it was convicted. In view of these facts and the existing law, the issue of the extent to which NRAC's claims may be pass-through claims bears on this case, and the issue is neither addressed in nor resolved by either of the parties' respective motions.

The government also relies upon *Anderson v. United States,* 47 Fed.Cl. 438 (2000) in support of its argument that the criminal

acts of which Seawitch was convicted are imputed to NRAC. In this case, the court found that the criminal actions of the Chief Executive Officer (CEO) of a bank were imputed to the financial institution, third party beneficiaries to the contract, and the receiver of the failed thrift for purposes of the special plea in fraud statute. In support of its decision to impute the CEO's actions to the receiver, the court stated " 'a corporation can act only through its officers and agents, and when they are clothed with the authority to act for it, the corporation is responsible for their acts.' " *Id.* at 448 (quoting *Wagner Iron Works v. United States,* 146 Ct.Cl. 334, 337–38, 174 F.Supp. 956, 958 (1959)). The *Anderson* case is readily distinguishable from the case at bar in that it involved imputing the acts of a corporate official to the corporation and its receiver. Also, the court's holding that the third party beneficiaries' claims were extinguished was limited in that the court simply found that because the contract actions had been forfeited the third party beneficiaries could not pursue their claims. The *Anderson* case does not directly support the government's argument that the criminal convictions of a subcontractor should function to bar a contractor from asserting its claims.

In its moving brief, the defendant also relies upon *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), wherein the U.S. Supreme Court found that where a government representative who participated in the contract negotiations was also the vice president of a financial institution that benefitted from the contract at issue, the contractor was precluded from enforcing the contract. The government contended that the representative had violated the federal conflict-of-interest statute, and that his illegal conduct had tainted the whole transaction, thereby rendering the contract unenforceable. In reaching its conclusion that the contract could not be enforced, the Court stated:

> Although nonenforcement frequently has the effect of punishing one who has broken the law, its primary purpose is to guarantee the integrity of the federal contracting process and to protect the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction... It is this inherent difficulty in detecting corruption which requires that contracts made in violation of the [federal conflict-of-interest statute] be held unenforceable, even though the party seeking enforcement ostensibly appears entirely innocent ...

*Id.* at 564–65, 81 S.Ct. 294.

The Court also noted that it did not think that the result in this case was especially harsh because the party seeking enforcement was not naive regarding the conflict of interest. *Id.* at n. 19. The Court stated that the party seeking enforcement recognized the government official's conflict of interest almost from the outset of the negotiations, yet continually fortified his belief that his financial institution would be selected as the financing agent should a contract result from the negotiations. *Id.*

The Supreme Court stated that it was not simply imputing the fraudulent conduct of one party to another, rather, it had taken into consideration the extent of the party seeking enforcement's knowledge of/involvement in the fraudulent conduct. This notation by the Supreme Court concerning the knowledge/involvement of the party seeking enforcement highlights at least two glaring genuine issues of material fact in this case. These are: (1) Whether before or during contract performance plaintiff was aware or had reason to believe that the contract required asbestos removal and Seawitch was not an asbestos contractor duly licensed in Maryland; and (2) Whether during contract performance plaintiff was aware of Seawitch's activities related to the contract at issue that were the subject of the criminal conviction in *United States v. Ellis,* 172 F.3d 864 (Table) (4th Cir.1999). These issues are crucial to the resolution of the pending motion for summary judgment, as the case law does not support imputing liability from a subcontractor to a primary contractor and thereby barring its claims with no inquiry as to the knowledge/involvement of the primary contractor. *See also Godley v. United States,* 5 F.3d 1473 (Fed.Cir.1993) (interpreting *Mississippi Valley* in considering wheth-

er the contract was tainted by fraud or wrong-doing and therefore void *ab initio,* and stating that determining whether illegality taints a contract involves questions of fact).

■ The parties' motions and materials submitted in support thereof do not resolve the issue of NRAC's knowledge of and involvement in Seawitch's allegedly fraudulent conduct. The government's primary argument in support of its position is that NRAC allegedly breached contractual provisions in its performance of the scrapping of the Coral Sea because (1) it hired a subcontractor to perform asbestos removal work who was not a duly licensed contractor; and (2) Seawitch, its subcontractor, *inter alia,* disposed of asbestos and dumped harmful quantifies of oil, pollutants and refuse into United States waters in violation of various Federal and state laws. Defendant also contends that NRAC and its agents did not, upon committing or learning of any of the conduct of the type that comprised the basis for the criminal indictments come forward and disclose knowledge of such conduct. The government further avers that because NRAC is a "shell" corporation that routinely contracts with shipbreaking agents to do its work, it cannot escape the special plea in fraud statute.

In an attempt to provide documentation to support its claim that NRAC has responsibility for and knowledge of Seawitch's activities that were the subject of the criminal conviction, on April 9, two days before argument, the defendant sent to chambers a courtesy copy of Defendant's Request for Leave to File Supplemental Material Pertaining to the Court's Question Concerning *United States v. Ellis,* filed April 9, 2002. Also on April 9, the court received in chambers a courtesy copy of Plaintiff's Opposition to Defendant's Request for Leave to File Supplemental Material, filed April 11, 2002. At this point it became readily apparent to the court that there is, beyond doubt, a genuine issue of material fact concerning the extent to which NRAC had knowledge of or participated in the conduct that is the subject of the criminal convictions and allegedly fraudulent conduct. Defendant's Request for Leave to File Supplemental Material Pertaining to the Court's question Concerning *United States v. Ellis,* filed April 9, 2002 is denied.

In sum, upon considering the defendant's motion for summary judgment based upon the asserted special plea in fraud, there is a genuine issue of material fact as to whether before or during contract performance plaintiff was aware or had reason to believe that Seawitch was not an asbestos contractor duly licensed in Maryland. There is also, as previously stated, a genuine issue whether during contract performance plaintiff was aware of Seawitch's activities related to the contract at issue that were the subject of the criminal conviction in *United States v. Ellis,* 172 F.3d 864 (Table) (4th Cir.1999). The government's brief also leaves unresolved the issues of whether and to what extent plaintiff's claims are pass-though claims on behalf of Seawitch. Because, as set forth *infra,* these are threshold issues that need to be addressed in order to resolve the motion for summary judgment and there are genuine issues of material fact regarding each of them, the defendant's Motion for Summary Judgment Based upon the Special Plea in Fraud, filed March 29, 2001, is denied.

Plaintiff has cross-moved for summary judgment, alleging that the government's counterclaim based on a special plea in fraud should be dismissed. In support of its argument, plaintiff contends, *inter alia,* that Seawitch was an independent contractor and a totally distinct entity from NRAC. Upon review of the plaintiff's cross-motion for summary judgment it is, however, apparent to the court that there remain the same genuine issues of material fact as discussed in the context of the government's motion. Accordingly, the plaintiff's Cross–Motion for Summary Judgment Dismissing Defendant's Counterclaim, filed October 3, 2001, is denied.

### CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

(1) The government's Motion for Summary Judgment Based upon the Asserted Special Plea in Fraud, filed March 29, 2001 is **DENIED;**

(2) Plaintiff's Cross–Motion for Summary Judgment Dismissing Defendant's Counterclaim, filed October 3, 2001, is **DENIED**;

(3) The parties are directed to **CONFER** and agree on three mutually acceptable dates and times for a telephone status conference to discuss the course of further proceedings in this matter. The parties shall **FILE** a Status Report, on or before **June 5, 2002,** setting forth this information.