HVAC CONSTRUCTION COMPANY, INC., F/K/A Hatfield Heating & Air Conditioning Company, Inc., Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 91–992C, 92–202C.

United States Court of Federal Claims.

July 16, 1993.

Robert F. McMahan, Jr., Columbia, SC, for plaintiff.

Elizabeth A. Rinaldo, Washington, DC, with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, David M. Cohen, and Jeanne E. Davidson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion for partial summary judgment as to the portion of plaintiff's claim which seeks recovery of costs incurred in the removal and reinstallation of an asbestos containment barrier. For the reasons set forth below, the court grants defendant's motion.

## FACTS

On July 14, 1989, defendant United States Air Force, Contracting Division, Myrtle Beach Air Force Base, awarded firm fixed price construction contract No. F38606–89–C0015 (the contract) to plaintiff, Hvac Construction Company, Inc. (Hvac) f/k/a Hatfield Heating & Air Conditioning Company, Inc., as low bidder for the replacement of boiler # 1 at the Myrtle Beach Air Force Base Hospital (Hospital). The contract price was $130,137.00. The contract contemplated completion within 150 days of the Notice to Proceed. Defendant issued the Notice to Proceed on July 27, 1989, establishing a completion date of December 24, 1989.

Plaintiff submitted its first "material approval submittal" form for approval of the new boiler on July 27, 1989. The contracting officer denied approval of the proposed boiler on August 8, 1989 because plaintiff had furnished incomplete and insufficient information needed to verify the boiler's compliance with contract requirements. Plaintiff submitted five additional boiler approval submittals between September and November 1989 which the contracting officer likewise denied for lack of compliance with contract requirements. On December 12, 1989, the contracting officer approved plaintiff's seventh boiler approval submittal, dated December 7, 1989.

Meanwhile, on November 3, 1989, defendant issued contract modification P00001, which extended the performance time of the contract by thirty days and established a revised completion date of January 23, 1990. Defendant granted this enlargement of time in response to the damage which Hurricane Hugo wrought upon South Carolina in September 1989.[1]

Clause 4, section 01010, division 1 of the contract's Technical Provisions specified that "[b]oth boilers shall be operational at all times between [December 1, 1989] and [March 20, 1990]. On any other date at least one boiler shall be operational at all times." Two boilers served the Hospital facilities, yet only one boiler was in use at any given time. The contract required that both boilers be operational during the cold winter months because the boiler in use provided both hot water and heat to the Hospital. Therefore, a back-up boiler was necessary to ensure provision of heat and hot water should the on-line boiler fail.

One of the work items required of plaintiff was the removal of asbestos insulation from the existing boiler # 1. Contract Technical Provisions, div. 1, sec. 01010, cl. 1.1. Section 02075, division 2 of the contract's Technical Provisions, entitled *Removal and Disposal of Asbestos*, provided that plaintiff was to conduct asbestos removal in an "Asbestos Control Area." An "Asbestos Control Area" is an area which is "isolated by physical boundaries to prevent the spread of asbestos dust, fibers, or debris." Contract Technical Provisions, div. 2, sec. 02075, cl. 1.2.2.3. Plaintiff began constructing an asbestos containment barrier—enclosing the area within which it was to remove asbestos—on December 5, 1989. The containment barrier consisted of a wooden frame, stretching from floor to ceiling, with a polyethylene barrier hanging from the frame. The barrier surrounded boiler # 1 on three sides, paralleling boiler # 2 from the front to the rear of the boiler room. Since the barrier was composed of flammable material (e.g., wood and polyethylene), it posed a fire hazard. It was also potentially restrictive of movement in the boiler room.

Clause 11, section 01010, division 1 of the contract's Technical Provisions provided that Myrtle Beach Air Force Base Fire Regulations[2] and National Fire Prevention Association publication 241 (NFPA 241), entitled *Standard for Safeguarding Construction, Alteration, and Demolition Operations*, governed responsibilities for fire prevention during the course of construction on the contract. NFPA 241, clause 2–2.1, states that "[o]nly noncombustible panels or flame resistant tarpaulins or approved materials of equivalent fire retardant characteristics shall be used [as temporary enclosures]." Mr. Calhoun

---

**1.** The modification stated, in pertinent part:
  The contract completion date for this contract [sic] is changed from [December 24, 1989] to [January 23, 1990]. The reason for this extension is because [sic] of the damage caused by Hurricane Hugo. The contractor is having [sic] to reconstruct his office and his asbestos subcontractor's employees experienced great personal loss and had to arrange for temporary housing for their families.

**2.** Defendant provided the court with pages 17 and 19 of a document whose header reads "MBAFBR 92–1 2 December 1987" as an attachment to the declaration of defendant's project inspector on the contract, Mr. Calhoun C. Benton. The court assumes that the document's header is an abbreviation for "Myrtle Beach Air Force Base Regulations." The court notes that the lack of independent identification of this document, and the incomplete portions provided, rendered this document of little help in support of defendant's motion.

C. Benton, defendant's project inspector on the contract, stated

> While the hazards [of the flammable materials] did exist during asbestos abatement, these hazards were mitigated due to the purpose served by the containment structure (prevention of asbestos fibers contaminating the air during asbestos removal) and minimized due to the short length of time the containment structure needed to be in place.

Because it was imperative for both boilers to be operational at all times during the winter months, and because plaintiff still had not received approval of its boiler submittal by December 1, a potential problem arose as to the provision of a back-up boiler should boiler # 2 fail while plaintiff was in the midst of replacing boiler # 1. Therefore, defendant required that plaintiff submit and receive approval of plans for back-up heat and hot water prior to beginning any work on boiler # 1. Defendant deemed plaintiff's proposal to use space heaters, should boiler # 2 fail, unacceptable as deficient in terms of safety and hygiene.[3]

Although by December 12, 1989 plaintiff had received the requisite boiler approval from the contracting officer, plaintiff requested a stop work order on December 15 in light of the fact that defendant had denied its space heater proposal. Plaintiff's president, Mr. Fred L. Hatfield, Sr. "[felt it was] the only reasonable solution" at the time. Plaintiff requested that the stop work order "be in effect from [December 13, 1989] until the time when one boiler can be on line. This stop work order should be at no charge to the Government or Contractor." The contracting officer issued modification P00002 to the contract, effective December 18, 1989 through March 20, 1990, suspending performance of all asbestos and boiler removal work "at no additional cost to the government." The modification further provided a revised contract completion date of April 26, 1990, no change in the fixed price of the contract,

and noted that plaintiff refused to sign a release of claims against defendant for any problems or expenses incurred in the suspension of work.

Plaintiff had planned to leave the containment barrier in place during the work stoppage period, but defendant directed plaintiff to remove the barrier due to the hazard it posed. Plaintiff removed the barrier as directed. On March 19, 1990, the contracting officer issued contract modification P00003, terminating the suspension of asbestos and boiler removal work effective March 20, 1990. The contracting officer directed plaintiff to proceed with contract performance the following day, March 21. Plaintiff's project superintendent, Mr. William Harry Dill, in executing this modification, struck out the clause releasing defendant from liability for equitable adjustments relating to the suspension. In its place, Mr. Dill wrote "[c]ontractor refuses to sign release of claims." Plaintiff began reinstallation of the asbestos containment barrier on March 22, 1990.

Dissatisfied with plaintiff's progress on the project, the contracting officer informed plaintiff that defendant was considering termination for default. In her May 15, 1990 Show Cause Notice, the contracting officer notified plaintiff that it might submit any explanation as to its performance deficiencies if it chose. Mr. Hatfield, in his May 29, 1990 letter responding to this request, offered several reasons as to why the contract was behind schedule. Addressing the amount of time spent in obtaining approval of a new boiler, Mr. Hatfield wrote: "This is obviously not a problem caused by the Air Force.... The subcontractor's failure to perform was the primary cause of the delays on the job."

On June 7, 1990, the contracting officer issued contract modification P00004 terminating the contract for default. Among other instances of noncompliance with the contract, plaintiff had not completed the

---

**3.** Three problems existed with this proposed solution:
(1) space heaters could not fulfill the boiler's function of providing hot water; (2) the Hospital electrical system could not handle the strain from the number of space heaters necessary to provide an adequate heat supply; (3) space heaters in the presence of oxygen outlets in Hospital rooms would have constituted a fire hazard.

contract within the timeframe contemplated by the contract and modifications P00001 and P00002. On June 9, 1990, plaintiff submitted a claim to the contracting officer for $33,298.77, the amount it allegedly expended in removing and reinstalling the asbestos containment barrier. The contracting officer responded on August 7, 1990, denying plaintiff's claim for an equitable adjustment for those costs. Plaintiff timely appealed that decision by filing the present action in the United States Claims Court.[4]

## DISCUSSION

Summary judgment under RCFC 56(c) is properly granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). In considering a motion for summary judgment, the evidence must be viewed, and inferences drawn, in a light most favorable to the non-moving party. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed.Cir.1983).

■ Defendant is entitled to summary judgment on the issue of plaintiff's claimed entitlement to costs allegedly incurred in removing and reinstalling the asbestos containment barrier. This is so because the contracting officer directed plaintiff to remove and later reinstall the barrier as a result of the suspension of work. Although the contracting officer issued the stop work order itself, defendant was not responsible for the situation necessitating the suspension of work. A contractor is not entitled to an equitable adjustment pursuant to a suspension of work when the contractor was the cause of the suspension of work. Furthermore, removal of the barrier during the work stoppage period was a

reasonable precaution against fire, and the contracting officer's directive to remove and reinstall the barrier was an action taken pursuant to her duty to ensure compliance with applicable fire regulations.

Plaintiff spent nearly five months obtaining approval of a new boiler to replace boiler # 1, almost the entire contract performance time as originally contemplated. Plaintiff was aware of the contract provision that two boilers were to be operational at all times during the cold winter months. At the time plaintiff began constructing the asbestos containment barrier on December 5, 1989, it had received neither the requisite boiler approval, nor approval of its plan to provide back-up heat and hot water should boiler # 2 fail while it was in the midst of work on boiler # 1. In his May 29, 1990 letter to the contracting officer, Mr. Hatfield disclaimed fault on the part of defendant for the time spent in obtaining boiler approval. The removal and reinstallation of the barrier would have been unnecessary but for plaintiff's anticipatory construction and the stop work order.

■ Defendant asserts that the court should evaluate plaintiff's claim under the "Suspension of Work" clause, 48 C.F.R. § 52.212–12, incorporated into the contract in the Special Contract Requirements section. The court agrees. The clause provides that equitable adjustments are allowable for government-caused suspension or delay of an unreasonable length, but not for any contractor-caused suspension. *See John A. Johnson & Sons, Inc. v. United States*, 180 Ct.Cl. 969, 986, 990–91 (1967); *CCM Corp. v. United States*, 20 Cl.Ct. 649, 657–58 (1990); *Beauchamp Constr. Co. v. United States*, 14 Cl.Ct. 430, 436–37 (1988). Plaintiff has not alleged any government-caused delay, and has in fact affirmatively recognized that the government was not to blame for any delay as to the receipt of boiler approval.

Instead, plaintiff has blamed its subcontractor for the delay in the boiler approval

---

**4.** The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, enacted on October 29, 1992, changed the name of the United States Claims Court to the United States Court of Federal Claims. The United States Court of Federal Claims is the successor to the United States Claims Court in all respects.

submittal process. A prime contractor is responsible to the government for the acts and omissions of its subcontractors resulting from the subcontractors' obligations to the prime contractor to assist in the performance of the contract. *See Douglass Bros., Inc. v. United States*, 319 F.2d 872, 162 Ct.Cl. 289 (1963). Subcontractor delay is not excusable unless the cause of the delay was beyond the control and without the fault or negligence of the contractor. *Fairfield Scientific Corp. v. United States*, 611 F.2d 854, 861, 222 Ct.Cl. 167 (1979); *see* 48 C.F.R. § 52.249–10 (1989).[5] Plaintiff has offered no proof of such circumstances here. Thus, plaintiff is held responsible for the delay of its subcontractor as if plaintiff itself had caused the delay.

In sum, the situation leading to the work stoppage was of plaintiff's making, not defendant's. Therefore, plaintiff is not entitled to an equitable adjustment for costs incurred as a consequence of the work stoppage.

■ Moreover, the materials composing the asbestos containment barrier were flammable and constituted a fire hazard throughout the duration of the asbestos removal work. The barrier was potentially restrictive of movement in the boiler room. The court agrees with plaintiff's contention that the erection of the barrier was "government-authorized," notwithstanding NFPA 241 directives to the contrary. However, such government authorization of the hazardous barrier was qualified: while defendant deemed the danger which the barrier posed acceptable during the asbestos abatement period, it did not deem it acceptable during the period of work stoppage. Therefore, it was reasonable for the contracting officer to require plaintiff to remove the barrier during the work stoppage period, and to hold plaintiff responsible for the resulting costs. *See* 48 C.F.R. § 52.236–7 (1989); 48 C.F.R. § 52.236–13 (1989).[6]

The court finds that removal of the barrier was a reasonable precaution taken pursuant to the fire regulations governing the project. Plaintiff has not demonstrated any genuine issue of material fact in support of its contention that the barrier could have remained in place throughout the duration of the work stoppage. Therefore, partial summary judgment in favor of defendant is appropriate.

### CONCLUSION

For the reasons set forth above, the court grants defendant's motion for partial summary judgment. The parties are directed to file a joint status report within thirty days advising the court on how they wish to proceed with the case in light of this order. Such report shall include an account of the status of settlement negotiations.

**IT IS SO ORDERED.**

---

5. FAR 52.249–10 (April 1984), the termination for default clause, was incorporated into the contract in the Special Contract Requirements section.

6. FAR 52.236–7 (April 1984), the "Permits and Responsibilities" clause, and FAR 52.236–13 (April 1984), the "Accident Prevention" clause were incorporated into the contract in the Special Contract Requirements section.