**TRANSFAIR INTERNATIONAL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 01–608C.**

United States Court of Federal Claims.

Sept. 23, 2002.

Wilsie H. Adams, Jr., Washington, D.C., for plaintiff.

John N. Maher, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., for defendant, with whom was Assistant Attorney General Robert D. McCallum, Jr.

**OPINION**

ALLEGRA, Judge:

This contract case is before the court on defendant's motion to dismiss. Defendant claims that plaintiff is not entitled to payment for the transportation of humanitarian relief to Asmara, Eritrea, because a British subcontractor hired by plaintiff repeatedly employed Iranian airliners in violation of various provisions of Federal law. In its complaint, and again on brief, plaintiff strenuously asseverates that, at the time the goods were transported, it was unaware of its subcontractor's actions and, therefore, should not suffer the forfeiture of its agreed compensation. The court deems oral argument on defendant's motion unnecessary. Having carefully reviewed plaintiff's complaint and the exhibits attached thereto, as well as the briefs filed by the parties, the court concludes that plaintiff's complaint states a claim under the applicable legal standards and that defendant's motion, therefore, must be denied. As will be seen, those same legal standards require this court to weigh various facts that have not yet been established.

## I. FACTS [1]

The contract in question involved the delivery of humanitarian relief supplies. On June 7, 2000, the United States Agency for International Development ("USAID") issued a Request for Proposals ("RFP") to transport humanitarian relief supplies from Pisa, Italy to Asmara, Eritrea. The RFP required that offerors specify the name of the aircraft owner and operator, the aircraft type and flag type, the proposed delivery schedule, and the route, while providing that "U.S. flag and non-U.S. flag carriers may be offered." On June 9, 2000, Transfair International, Inc. ("Transfair") submitted a proposal in response to this RFP in which it indicated that it would be using either a Ukrainian or Romanian carrier to make the delivery. On June 9, 2000, USAID awarded to Transfair a fixed-price contract for transport freight services in the amount of $258,720.00. The award letter referred broadly to the terms of the RFP and Transfair's proposal, but did not specifically address the issue of the carrier's flag.

The contract required Transfair to secure three flights to deliver the humanitarian relief supplies between June 13 and June 16, 2000. Transfair completed the requisite deliveries on June 16, 2000. Toward this end, Transfair subcontracted its duties under the contract to Coyne Airways Ltd., a British corporation ("Coyne"). Coyne had originally planned to use a Ukrainian operator to make the delivery, but allegedly as a result of bombing near the airport in Asmara, the Ukrainian government directed that no Ukrainian aircraft could fly to Asmara. Allegedly unbeknownst to Transfair, Coyne then hired an Iranian aircraft to fulfill the contract obligations.

After the first flight's arrival in Eritrea, USAID contacted Transfair to determine the flag of the performing aircraft and inquired whether the performing aircraft was registered as an Iranian flag. Transfair assured USAID that the aircraft was Ukrainian, and not Iranian. After the second flight's arrival, USAID again inquired about the aircraft's flag, and Transfair responded that the aircraft was Ukrainian, but indicated that it would verify the flag with Coyne. After the third flight had departed for the final delivery, Transfair contacted USAID and confirmed that the performing aircraft and operator for all three flights had indeed been Iranian. Transfair allegedly was unaware of the true nationality of the aircraft until after two of the flights had been completed and the third flight was in the air.

After completing the shipments, Transfair billed USAID for the contract amount. USAID refused to pay on the grounds that Coyne's use of an Iranian aircraft was a major breach of the contract. The agency asserted that Coyne's illegal actions were attributable to Transfair and constituted a violation of Federal Acquisition Regulation ("FAR") § 25.701,[2] as well as Treasury Department and USAID regulations (respectively 31 C.F.R. § 560.701 and 22 C.F.R. § 228.03), all of which generally prohibited a government contractor from using an aircraft operated by a company licensed and registered in a foreign policy restricted country, such as Iran. Pursuant to the Contract Disputes Act, Transfair submitted to the contracting officer a claim in the amount of $258,720.00, plus interest, premised on two grounds: (i) *quantum meruit*, because Transfair performed the contract and USAID received the benefit of that performance; and (ii) a waiver argument reasoning

---

1. "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court must presume that the factual allegations included in the complaint are true. *See Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988).

2. FAR § 25.701(a)(1) provides that "except as provided in paragraph (a)(2) of this section, even for overseas use, agencies and their contractors and subcontractors must not acquire any supplies or services originating from sources within, or that were located in or transported from or through ... Iran." The exception in paragraph (a)(2) allows a contracting officer to acquire for use outside the United States restricted supplies and services in unusual circumstances, such as emergencies or where supplies or services are not otherwise available.

that because FAR § 25.701(2)(i) permits the contracting officer to waive the carrier restrictions, it should be implemented to permit payment of Transfair. Alternatively, Transfair asserted that the possibility of waiver indicates that violation of the regulation is only a minor and not a major breach of contract. On October 24, 2000, the contract officer denied Transfair's claim on the basis that public policy considerations counseled against payment, which would be the equivalent of a transfer of government funds directly to an Iranian organization. The contracting officer found that subcontracting with an Iranian company was a major breach of a government contract, in part because such a contract could subject the contractor to severe civil and criminal penalties under Treasury regulations.

On October 24, 2001, plaintiff filed the instant complaint, which seeks payment of the full contract price plus interest. On March 15, 2002, defendant filed a motion to dismiss for failure to state a claim upon which relief can be granted. *See* RCFC 12(b)(4). A response and reply to that motion have since been filed.

## II. DISCUSSION

■ From the dawn of the common law tradition in England, courts generally have refused to implement contractual undertakings that, when measured against prevailing mores, contravene public policy. *See* 1 Edward Coke, Institutes of the Laws of England: A Commentary upon Littleton 19 (Thomas ed. 1827) ("nihil quod est inconveniens est licitum"); Percy H. Winfield, "Public Policy in the English Common Law," 42 Harv. L.Rev. 76, 79 (1928) (hereinafter "Winfield, Public Policy"). For its part, the Supreme Court has often applied this concept, describing it recently in the following terms: "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Town of Newton v. Rumery,* 480 U.S. 386, 392, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987); *see also Crites, Inc. v. Prudential Insurance Co.,* 322 U.S. 408, 418, 64 S.Ct. 1075, 88 L.Ed. 1356 (1944); *Weil v. Neary,* 278 U.S. 160, 171–174, 49 S.Ct. 144,

73 L.Ed. 243 (1929); *Woodstock Iron Co. v. Richmond & Danville Extension Co.,* 129 U.S. 643, 662–663, 9 S.Ct. 402, 32 L.Ed. 819 (1889). This doctrine is potentially applicable both where a bargain is illegal in its formation or its performance. *See* Restatement (Second) of Contracts § 512 (1979). However, the simplicity of the notion that illegal bargains are unenforceable is deceiving and represents a trap for the unwary or overzealous, particularly where, as here, it is unclear whether the party seeking to enforce the contract term actually participated in the illegality and, especially, where the impact of applying the doctrine is to effectuate a forfeiture of payment for services already rendered.

It is beyond peradventure that serious foreign policy considerations are at issue here. Long before President Bush identified Iran as part of the "axis of evil," the United States, through an extensive statutory and regulatory framework, had already severely restricted commercial transactions with that country. Thus, in 1995, under the authority of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.,* President Clinton announced in Executive Orders 12957 and 12959 that the actions and policies of the Iranian government constituted an extraordinary threat to the national security, foreign policy and economy of the United States. 60 Fed.Reg. 14615 (1995); 60 Fed.Reg. 24757 (1995); *see generally United States v. Ehsan,* 163 F.3d 855 (4th Cir.1998). To implement these executive orders, the Office of Foreign Assets Control promulgated the Iranian Transactions Regulations, the relevant portion of which provides that "no United States person, wherever located, may engage in any transaction or dealing in or related to (1) goods or services of Iranian origin or owned or controlled by the Government of Iran...." 31 C.F.R. § 560.206 (2000). Violations of these provisions are governed by the IEEPA, but, more specifically, the Iranian Transactions Regulations provide that one who violates these provisions is subject to "a civil penalty of not to exceed $11,000 per violation," and whoever willfully violates these provisions, upon conviction, shall be fined "not more than $50,000, or, if a natural

person, may be imprisoned for not more than ten years, or both." 50 U.S.C. §§ 1701, 1705 (2000); 31 C.F.R. § 560.701 (2000).[3]

The heart of the defendant's case is its contention that plaintiff is responsible for the acts of its subcontractor and that the subcontractor's hiring of the Iranian airliners, in violation of the foregoing provisions of law, renders the contract unenforceable. Under defendant's view, it matters not whether plaintiff knew that the Iranian airliners were to be employed or, conversely, took reasonable steps to prevent this. Rather, according to defendant, Transfair is strictly liable for the illegal acts of its subcontractor in performing the contract and thus irrevocably and absolutely forfeited its right to be paid under that contract. While the imposition of such strict liability undoubtedly would "maximize[ ] deterrence and ease[ ] enforcement difficulties," *Dept. of Housing and Urban Development v. Rucker*, 535 U.S. 125, 122 S.Ct. 1230, 1235, 152 L.Ed.2d 258 (2002), a number of considerations drive this court to reject this approach.

As mentioned, in asserting that Transfair is strictly liable for the illegal actions of its subcontractor, defendant initially argues that the Federal Circuit and this court "have consistently recognized" that a prime contractor is responsible for the acts and omissions of its subcontractor. It thus urges this court to analyze the case *sub judice* as if Transfair itself had hired the Iranian airliners. But, as will be seen, the broad attribution rule espoused by defendant is a phantom, neither "consistently recognized" in the case law, nor even "recognized" at all, at least as a free-standing principle of government contract law.

Take, for example, *Hvac Construction Co. v. United States*, 28 Fed.Cl. 690 (1993), a case featured in defendant's brief. There, this court tackled the question whether the plaintiff was entitled to certain costs when the government terminated its contract for default. This issue turned, in part, on whether a subcontractor had unnecessarily delayed performance. In concluding that the contractor was responsible for this delay, this court did not establish a general rule of attribution applicable to all government contracts, but instead merely construed the default termination provision in the specific contract at issue. Ignoring the latter context, defendant confidently quotes that portion of *Hvac*, 28 Fed.Cl. at 694, which, in discussing this contract provision, states that "a prime contractor is liable to the Government for the acts and omissions of its subcontractors resulting from the subcontractors' obligations to the prime." Any notion, however, that this language was intended to establish a broad general rule of attribution is foreclosed not only by its context, but also by the next sentence of the opinion, which, in language defendant did not trouble to quote, states that the subcontractor's failure was "not excusable *unless the cause of the delay was beyond the control and without the fault or negligence of the contractor.*" *Id.* at 694 (emphasis added). The latter statement, in fact, was drawn from the default provision in the contract, which, in turn, derived from 48 C.F.R. § 52.249–10 (1989).[4]

---

**3.** In addition, the Foreign Assistance Act ("FAA") provides that funds made available under that Act may be used by the President for procurement only in the United States, the recipient country, or developing countries, and when necessary for emergency situations or to promote efficiency in the use of resources. 22 U.S.C. § 2354(a)(1)(B)(ii) (2001). To implement the FAA provisions, USAID promulgated 22 C.F.R. § 228, which regulates the source, origin, and nationality for commodities and services financed by USAID. 22 C.F.R. § 228.03 lists geographic codes to designate the countries from which procurement could take place for given contracts, but excludes "foreign policy restricted countries: Afghanistan, Libya, Vietnam, Cuba, Cambodia, Laos, Iraq, Iran, North Korea, Syria, and People's Republic of China." 22 C.F.R.

§ 228.03(b) (2000). The regulations provide that commodities from foreign policy restricted countries are ineligible for USAID financing, but make no mention of the consequences of employing commodity-related services from restricted countries like the deliveries at issue here. 22 C.F.R. §§ 228.11b, 228.22 (2000). While the FAA grants USAID's Office of Foreign Disaster Assistance the authority to conduct activities notwithstanding any other provision of law, defendant asserts that "USAID only relies upon this authority sparingly and has never relied upon it in circumstances similar to those at issue in this case."

**4.** In pertinent part, FAR 52.249–10 (1989), provided:

Finding that the plaintiff had "offered no proof of such circumstances here," that is, no proof that it was without fault or negligence, the court then concluded that "plaintiff is held responsible for the delay of its subcontractors as if plaintiff itself had caused the delay." 28 Fed.Cl. at 694. *See also Fairfield Scientific Corp. v. United States*, 222 Ct.Cl. 167, 611 F.2d 854, 861 (1979). Accordingly, *Hvac* established no general rule of attribution, but instead merely construed a contract provision and, to boot, one which made the prime contractor liable for its subcontractors' actions only where it was at fault or negligent. Defendant's reliance on this case as its best evidence that this court has "consistently recognized" a strict rule of attribution is thus perplexing, more than a little misleading and, ultimately, unavailing.

In two other cases cited by defendant—*Douglass Bros., Inc. v. United States*, 162 Ct.Cl. 289, 304, 319 F.2d 872 (1963) and *Neal & Co. v. United States*, 36 Fed.Cl. 600, 636–37 (1996), *aff'd*, 121 F.3d 683 (Fed.Cir. 1997)—the courts found that the prime contractors were responsible for the misfeasance of, or delays occasioned by, their respective subcontractors. They did so, however, only in passing, and without the slightest indication why. Forced, by the absence of any apparent rationale, to speculate, this court believes that while the holdings in these cases may, as in *Hvac, supra*, derive from an undisclosed contract provision, they more likely stem from the application of traditional agency principles. Whatever their hidden rationale, these cases certainly provide no analytical stepping stone from which to leap to the conclusion that a prime contractor should be strictly responsible for the illegal or fraudulent actions of its agent irrespective of its own knowledge, fault or negligence with respect to that illegality. Indeed, these cases involved relatively mundane tasks, such as the installation of electrical wiring or drywall, or the conduct of earthwork and grading. As such, they do not begin to suggest the existence of some additional legal basis, other than contract or common law principles of agency, upon which to impute the actions of a subcontractor to its principal. Instead, *Douglass* and *Neal* provide little more than empirical evidence that attribution sometimes occurs, without the slightest analytical indication that such attribution ought to occur here.

The only other case cited by defendant in support of its no-fault attribution rule is *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir.1983). That case is also inapposite. There, the United States appealed from a final decision of the Armed Services Board of Contract Appeals, which had held that it had jurisdiction, under the Contract Disputes Act of 1978, to decide a claim brought directly by a subcontractor; that the subcontractor was the proper party to certify the claim under the Act; and that the subcontractor was entitled to an equitable adjustment for supplying redundant hardware. The Federal Circuit held that the subcontractor could not recover directly from the United States (the party to receive the benefits of the contract) for amounts owed to it by the prime contractor because: (i) there was no express or implied contract between the government and the subcontractor and (ii) the prime contractor was not acting as an agent of the United States in dealing with the subcontractor. As such, the court concluded that no privity existed between the government and the subcontractor, preventing the subcontractor from suing the government directly. *Id.* at 1550. Accordingly, *Johnson* involved whether the actions of a prime contractor could be attributed to the government and did not discuss, even in *obiter dicta*, the wholly different question pre-

Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor. This provision is similar to the default provision in the current FAR. *See* 48 C.F.R. § 52.249–10 (2001). Notably, it appears that defendant did not invoke the default provision in the contract at issue.

sented here—*to wit,* whether the prime contractor is responsible to the government for the actions of its subcontractor. This case, too, lends absolutely nothing, by way of support, to defendant's case.

As such, cases that support defendant's first proposition are conspicuous by their absence. Indeed, various authorities suggest, contrariwise, that a prime contractor is not strictly liable for the illegal actions of its subcontractor. Perhaps the clearest expression of this is in *N.R. Acquisition Corp. v. United States,* 52 Fed.Cl. 490 (2002), where this court considered whether, under the special plea in fraud statute, the fraudulent acts for which a subcontractor had been criminally convicted could be imputed to the prime contractor so as to bar that contractor's claim against the government. Defendant argued, much as it has here, that whether the prime contractor "encouraged these criminal activities or 'simply turned a blind-eye,' the end result is the same and the plaintiff's claim should be forfeited in their entirety." 52 Fed.Cl. at 496 (quoting defendant's brief). Reviewing various cases, this court, however, made short shrift of this contention, concluding that the case law "does not support imputing liability from a subcontractor to a primary contractor and thereby barring its claims with no inquiry as to the knowledge/involvement of the primary contractor." 52 Fed.Cl. at 500. The Second Circuit suggested a similar result in *Nat'l Petrochemical Co. of Iran v. the M/T Stolt Sheaf,* 930 F.2d 240 (2d Cir.1991). There, it held that an Iranian company's contracts to purchase chemicals were unenforceable as violative of U.S. trade embargo. But, the court did so only upon finding that the company was aware of the embargo, postulating that the company "might [have been] entitled to enforce the contracts if it had been truly unaware of the illegality." 930 F.2d at 243.

Reasoning of this sort suggests that common law principles of agency, including the concepts of actual or apparent authority, may provide guideposts for deciding whether or not to attribute Coyne's illegal conduct to

Transfair.[5] For example, the Fourth Circuit has stated that "a principal is responsible for the illegal acts of an agent [unless] those acts were 'clearly inappropriate to or unforeseeable in the accomplishment of the authorized result.'" *N.L.R.B. v. Georgetown Dress Corp.,* 537 F.2d 1239, 1244 (4th Cir.1976) (quoting Restatement (Second) of Agency § 231, cmt. a.). *See also* Restatement (Second) of Agency §§ 34, 411. The rationale behind this rule "is that if the act is not appropriate or expected, it can be neither authorized nor incidental to an authorized act." *Bates v. United States,* 517 F.Supp. 1350, 1358 (W.D.Mo.1981), *aff'd,* 701 F.2d 737 (8th Cir.1983); *see also Lyon v. Carey,* 385 F.Supp. 272, 273 (D.D.C.1974). In a similar vein, the Restatement (Second) of Agency suggests that a principal may be liable for the illegal actions of its agent if either the illegal acts were taken by the agent at the principal's direction, *id.* at § 19 cmt. c., or if the agent had apparent authority to perform its tasks in an illegal or unlawful fashion, *id.* at § 161. *See also United States v. Sun-Diamond Growers,* 138 F.3d 961, 970 n. 9 (D.C.Cir.1998), *aff'd,* 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998). In this court's view, resolving whether and how these agency principles (or others yet to be identified) apply herein requires factual development that has not yet occurred.

For all the foregoing reasons, defendant is simply incorrect in arguing that a prime contractor is strictly liable for all the acts and omissions of the subcontractor in the performance of a contract. Rather, it appears that courts at least consider the prime contractor's knowledge or involvement in deciding whether to hold it responsible for the subcontractor's misfeasance or malfeasance. This inquiry does not float amorphously in the ether, as defendant seemingly believes, but rather is grounded on the relevant contract provisions and, potentially, the impact of agency law principles. In the instant case, it thus appears relevant, for example, what plaintiff knew and when it knew it.

---

5. Courts, for example, have applied such agency principles in deciding whether to impute an agent's fraud to the debtor-principal under vari-

ous provisions of the Bankruptcy Code. *See, e.g., In re Cohn,* 54 F.3d 1108, 1119 (3d Cir.1995); *In re Walker,* 726 F.2d 452, 454 (8th Cir.1984).

■ That leads us to defendant's second main proposition—that the illegal performance of this contract renders it *per se* unenforceable. This claim, too, appears defective. In support of this claim, defendant relies, *inter alia*, on Chapter 8 of the *Restatement (Second) of Contracts*, which deals with the unenforceability of bargains on the grounds of public policy, and cites, specifically, section 178 thereof. Perhaps, a highly selective reading of paragraph (1) of that section lends superficial credibility to defendant's position, as it provides that "[a] promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." *Id.* at § 178(1). Yet, even this sentence, particularly, the "clearly outweighed" language, suggests anything but an absolute rule of unenforceability. This suspicion is immediately confirmed by the next two paragraphs of this section, which explicitly describe a balancing test for deciding whether not to enforce a contract term on grounds of public policy. Mapping generally the contours of this analysis, these paragraphs indicate that courts should weigh the following factors: (i) the parties' justified expectations; (ii) any forfeiture that would result if enforcement were denied; (iii) any special public interest in the enforcement of the particular term; (iv) the strength of that policy as manifested by legislation, regulations or judicial decisions; (v) the likelihood that a refusal to enforce the term will further that policy, (vi) the seriousness of any misconduct involved and the extent to which

it was deliberate; and (vii) the directness of the connection between that misconduct and the term. Restatement (Second) of Contracts § 178(2) & (3).[6]

The accompanying commentary injects yet additional considerations into this balancing analysis. Thus, regarding the parties' justified expectations, comment e to section 178 provides that "[t]he promisee's ignorance or inadvertence,... is one factor in determining the weight to be attached to his expectations." *Id.* at cmt. e.; *see also id.* at § 180 (indicating that, in some circumstances, a promisee "excusably ignorant of the facts" that contravene the public policy may enforce the contract). Burnishing the factor that considers the nexus between the illegal performance and the contract terms, comment d to this same section states that "[a] party will not be barred from enforcing a promise because of misconduct that is so remote or collateral that refusal to enforce the promise will not deter such conduct and enforcement will not amount to an inappropriate use of the judicial process." *Id.* § 178 at cmt. d. Rounding out this analysis, comment c indicates that "[a] disparity between a relatively modest criminal sanction provided by the legislature and a much larger forfeiture that will result if enforcement of the promise is refused may suggest that the policy is not substantial enough to justify the refusal." *Id.* at cmt. c.

Far from supporting a strict prophylactic rule on illegality, then, the Restatement (Second) of Contracts categorically rejects such an approach in favor of a fact-driven inquiry—*to wit*, whether the enforcement of a

---

**6.** In describing this balancing approach, comment b to this section of the Restatement (Second) states:

Only infrequently does legislation, on grounds of public policy, provide that a term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability.... In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it

plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms. The most common factors in the balancing process are set out in Subsections (2) and (3). Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term.

contract term "is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Town of Newton*, 480 U.S. at 392, 107 S.Ct. 1187. This approach has been adopted by numerous courts, among them the Seventh Circuit, which has stated that "the defense of illegality, being in character if not origins an equitable and remedial doctrine, is not automatic but requires ... a comparison of the pros and cons of enforcement." *Northern Indiana Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 273 (7th Cir.1986).[7] Mindful of the reciprocal dangers of overdeterrence and underdeterrence,[8] the Restatement, as well as the associated case law, thus require a balanced consideration of such things as: (i) the culpability of the promisee, including what it knew about the illegality; (ii) the corresponding culpability of the promisor, including whether it knew about the illegality prior to the completion of performance; (iii) whether effectuating a forfeiture, under the circumstances of a given case, would serve the public purposes at issue, including deterring future violations of any statute or regulation involved; and (iv) finally, whether any forfeiture resulting from the nonenforcement of the contract terms is proportional to the illegality, considering, *inter alia*, how that penalty compares to the civil and criminal penalties directly imposed for the violation of the same statutes or regulations.[9] Merely to identify these factors as being relevant is to refute defendant's contention that the contract is unenforceable irrespective of what Transfair knew, whether its overall actions were reasonable, and what the USAID officials knew as they supervised the loading of the planes bound for Eritrea.[10]

In a list ditch effort to salvage its position, defendant cites *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961). In that case, the Supreme Court found that where Adolph Wenzell, a government representative who participated in the contract negotiations, was also the vice president of a financial institution that benefitted from the contract at issue, the contractor was precluded from enforcing the contract under the federal conflict-of-interest statute, 18 U.S.C. § 434. In reaching this conclusion,

---

7. *See also, e.g., Paul Arpin Van Lines, Inc. v. Universal Transportation Servs., Inc.*, 988 F.2d 288, 290 (1st Cir.1993); *Lambert v. Kysar*, 983 F.2d 1110, 1119 (1st Cir.1993); *Kidder, Peabody & Co., Inc. v. IAG Int'l. Acceptance Group N.V.*, 28 F.Supp.2d 126, 139 (S.D.N.Y.1998) ("Rather, when determining whether to enforce the provisions of an illegal contract, courts weigh a variety of factors, such as the repugnance of the illegality, the express provisions of the statute violated and the public policy considerations in refusing to allow recovery under the contract"), *aff'd*, 205 F.3d 1323 (2d Cir.1999); *Nat'l R.R. Passenger Corp. v. Consolidated Rail Corp.*, 670 F.Supp. 424, 433 (D.D.C.1987) (weighing factors in deciding whether to invalidate portion of Amtrak contract based on public policy); *In re Gorman*, 274 B.R. 351, 360 (Bankr.D.Vt.2002) (employing the Restatement's multi-factored balancing test). The opinion by the Maryland Supreme Court in *Maryland–National Capital Park and Planning Commission v. Washington Nat'l Arena*, 282 Md. 588, 386 A.2d 1216, 1229–30 (1978), aptly describes this approach, stating, "[e]nforcement [of a contract] will be denied only where the factors that argue against implementing the particular provision clearly and unequivocally outweigh 'the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement' of the contested term." *See also* Juliet P. Kostritsky,

"Illegal Contracts and Efficient Deterrence: A Study in Modern Contract Theory," 74 Iowa L.Rev. 115 (1988).

8. While defendant's brief urges this court to adopt its position to avoid underdeterrence, it seemingly fails to consider the risk of overdeterrence inherent in its position, particularly, whether other contractors would bid on certain risky government contracts if they knew that their compensation thereunder could be entirely forfeited if a subcontractor, unbeknownst to them and even against their instructions, violated some critical provision of Federal law.

9. In this regard, the court notes, for potential future consideration, that the maximum civil fine for violating the Iranian Transaction Regulation appears to be $11,000 per violation, while the maximum criminal fine for wilfully violating those provisions appears to be $50,000. Here, by comparison, the amount of the contract was $258,720.00.

10. It is somewhat ironic that while defendant pedantically asserts that plaintiff should have constructive knowledge of anything its subcontractor knew, it sheepishly denies that it should be held to the same standard as to information that USAID's representatives in Italy may have possessed regarding the use of the Iranian airliners.

the Court analyzed the statute's language and determined that each of the objective elements of the statute were met, concluding that Wenzell's duality "was the very type of conflict at which the statute is aimed." 364 U.S. at 561, 81 S.Ct. 294. The Court next concluded that, under the statute, Wenzell's illegal conduct rendered the contract unenforceable, finding this result "essential to effectuating the public policy embodied in Section 434." 364 U.S. at 563, 81 S.Ct. 294. Lastly, the Court rejected the notion that the innocence of the party seeking to enforce the contract should prevent the contract from being unenforceable, stating:

> Although nonenforcement frequently has the effect of punishing one who has broken the law, its primary purpose is to guarantee the integrity of the federal contracting process and to protect the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction ... It is this inherent difficulty in detecting corruption which requires that contracts made in violation of the [federal conflict-of-interest statute] be held unenforceable, even though the party seeking enforcement ostensibly appears entirely innocent.

364 U.S. at 564–65, 81 S.Ct. 294. Nonetheless, the Court recognized that the contractor was not innocent of fraud. It noted that the Mississippi Valley "recognized Wenzell's conflict of interest almost from the outset of the negotiations," yet took no action to diffuse the conflict. *Id.* at 565, n. 19, 81 S.Ct. 294. In the Court's view, the contractor implicitly condoned an illegality that permeated the contract, without which, "no contract would have been made." 364 U.S. at 553, 81 S.Ct. 294.

Unlike the instant case, the real focus of *Mississippi Valley* was on a specific statute—one which the Court construed as compelling it to render the contract unenforceable. The Court's rigid approach thus was driven by the desire to effectuate clearly articulated congressional goals and policies, which, in the Court's view, left no room for consideration of the type of factors highlighted by the Restatement.[11] The case *sub judice* arises under a different regime. It does not involve a simple matter of Congressional intent—indeed, in its motion, defendant does not invoke the fraudulent claim statute or any other statutory provision that might compel this court to hold the contract unenforceable. Instead, our focus is essentially on common law principles, rooted partially in equity, that simply have not been applied in the same unyielding fashion as the conflict-of-interest statute. *See Ciba–Geigy Corp. v. Alza Corp.*, 804 F.Supp. 614, 629 n. 8 (D.N.J. 1992) (distinguishing *Mississippi Valley* based on the particulars of the statute involved there); *see also* Winfield, Public Policy, 42 Harv. L.Rev. at 76–79 (discussing how the public policy doctrine originated in principles of equity). Indeed, it bears reemphasizing that *Mississippi Valley* ultimately did not involve a situation where a completely innocent contractor was seeking performance. That case thus does not compel this court to defenestrate the balancing test described by the Restatement.

Various cases have similarly refused to extend *Mississippi Valley* beyond its statutory borders. Prominent among these is *Godley v. United States*, 5 F.3d 1473, 1475–76 (Fed.Cir.1993), in which the Federal Circuit, interpreting *Mississippi Valley*, held that in considering whether a contract was tainted by fraud or wrong-doing and, therefore, unenforceable, this court was required to resolve questions of fact regarding the contractor's conduct and whether any illegality actually tainted the contract. Distinguishing *Mississippi Valley* further, the court noted:

> Thus, Mississippi Valley does not present a situation where a completely innocent contractor entered a contract with the Gov-

---

11. *See CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) (distinguishing *Mississippi Valley* stating, "[t]hat holding, however, rested solely on the Court's conclusion that the government employee had violated the conflict of interest statute."); *Trilon Educational Corp. v. United States*, 217 Ct.Cl. 266, 578 F.2d 1356, 1360 (1978) (same); *see also United States v. Acme Process Equipment Co.*, 385 U.S. 138, 146, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) (applying a similar analysis to the Anti–Kickback Act, 41 U.S.C. § 51); *Stuart Park Associates Ltd. Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1326 (7th Cir.1995).

ernment which, despite illegal conduct by a Government agent associated with the contract, was nonetheless wholly untainted by fraud. Rather, in Mississippi Valley, the contractor, with knowledge, implicitly condoned the illegal conflict of interest.

5 F.3d at 1475 (footnotes omitted). Other binding precedents further emphasize the need to show that the illegality was obvious or palpable to the contractor, again suggesting a concomitant need for factual inquiries here. *See Total Medical Management, Inc. v. United States*, 104 F.3d 1314, 1321 (Fed. Cir.1997) (contract unenforceable where contractor was "on actual notice" of the illegality); *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438, 440 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964) (court refused to enforce nullification of contractor due to illegality, stating that "the court should ordinarily impose the binding stamp of nullity only when the illegality is plain."); *Trilon Educational Corp.*, 578 F.2d at 1360 (innocent bidders should recover on contracts not "palpably illegal"); *see generally, United States v. Amdahl Corp.*, 786 F.2d 387, 395 (Fed.Cir. 1986).[12]

## III. CONCLUSION

This court is mindful of the vital foreign policy concerns at issue and the result here is in no way intended to denigrate those concerns. But, the short of the matter is that while it is highly relevant that legal requirements, tied to those concerns, were apparently violated here, that fact alone is not decisive. Rather, this court must determine, first, whether, under the circumstances, plaintiff is responsible for the illegal performance of its subcontractor and, then, applying the balancing test of the Restatement, consider whether the nature of that illegality was such as to warrant the forfeiture of all compensation. As fact issues lurk beneath both considerations, this court must deny defendant's motion.

The court hesitantly adds a coda. The court is somewhat dismayed by the briefs filed by defendant in support of its motion to dismiss. Based on long-standing traditions, the judges of this court rightfully expect Justice Department lawyers to exercise diligence in advancing arguments and citing cases for various legal propositions. Those expectations are threatened when a motion to dismiss is seemingly viewed as an opportunity to throw half-baked arguments against the wall in hopes that something will stick. At the least, such conduct conflicts with the ideals captured in the inscription on the rotunda of the Attorney General's office, which states "[t]he United States wins its point whenever justice is done its citizens in the courts." Continuation of this conduct also risks the imposition of sanctions. *See* RCFC 11; 28 U.S.C. § 2412. The court strongly suggests that defendant's attorneys demonstrate considerably more circumspection in the future.

Based on the foregoing discussion, defendant's motion to dismiss is **DENIED**. Defendant shall file its answer to plaintiff's complaint no later than October 25, 2002.

**IT IS SO ORDERED.**

---

12. Notably, defendant's motion fails to address plaintiff's claim that it is also entitled to recovery under the doctrine of *quantum meruit* or *quantum valebant*. This theory was raised by plaintiff before the contracting officer and seemingly preserved by its broadly-drafted complaint. In fact, on multiple occasions, the Federal Circuit has held that, in appropriate circumstances, a con-

tractor may recover under these implied-in-fact contract theories, even where a contract is declared illegal. *See, e.g., Gould, Inc. v. United States*, 935 F.2d 1271, 1275 (Fed.Cir.1991) ("A court may grant equitable relief under an illegal contract if the government received a benefit from the contractor's performance"); *Amdahl Corp.*, 786 F.2d at 393 (same).